UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY CESARIO, STEVE CIESLAK, GREGORY LAROCCO, JAMES LEE, FRANK ANDERSON, EDWARD ESBOLDT, and LESTER NELSON, | |
| Plaintiffs, | No. 17 CV 319 |
| v. | Judge Manish S. Shah |
| JEWEL FOOD STORES, INC., NEW ALBERTSON'S INC., and JEWEL OSCO SOUTHWEST LLC, | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Plaintiffs managed operations in grocery stores owned and operated by defendants. They allege that defendants treated them poorly and discriminated against them due to their age and disabilities, and they bring claims under two federal statutes. They also bring state-law claims for the intentional infliction of emotional distress. Defendant Jewel Food Stores, Inc., moves to dismiss nine of the twenty-five counts alleged in the complaint for lack of subject-matter jurisdiction and for failure to state a claim. For the following reasons, the motion is granted.

I.      **Legal Standards**

A court must dismiss an action if it determines, at any time, that it lacks subject-matter jurisdiction, Fed. R. Civ. P. 12(h)(3), and a defendant may move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The

plaintiff bears the burden of proving that jurisdiction is proper. *Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but need not accept legal conclusions or conclusory allegations. *Id.* at 678–79. With a 12(b)(6) motion, a court may consider only allegations in the complaint, documents attached to the complaint, and documents that are both referred to in the complaint and central to its claims. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

## II. Facts

Plaintiffs Timothy Cesario, Steve Cieslak, Gregory LaRocco, James Lee, Frank Anderson, Edward Esboldt, and Lester Nelson are each at least 56 years old and worked for defendant Jewel Food Stores, Inc., as a store director in one of defendant's 185 grocery stores.[1] [21] ¶¶ 4–10, 17, 20, 23, 26, 29, 32, 35, 38.[2] Most of defendant's stores employed two store directors: one to manage operations related to the store's food products and one to manage operations related to the store's drug products. [21] ¶¶ 41, 44. Plaintiffs Cesario, Cieslak, Anderson, Nelson, and Esboldt

---

[1] The complaint names as defendants three entities: Jewel Food Stores, Inc., New Albertson's Inc., and Jewel Osco Southwest LLC. Defendant Jewel Food Stores, Inc., filed the present motion, claiming that it alone was plaintiffs' employer, and that the other two defendants are not properly named in this suit. Plaintiffs do not address this point, and it ultimately has no bearing on whether plaintiffs' claims may proceed. Thus, I refer to plaintiffs' employer as "defendant."

[2] Bracketed numbers refer to entries on the district court docket. The operative complaint is [21].

2

oversaw food-product operations in their respective stores, while plaintiffs LaRocco and Lee managed their stores' drug-product operations. [21] ¶ 45.

In April 2011, defendant consolidated the management duties for its stores and made one store director at each store responsible for both food- and drug-product operations. [21] ¶ 46. Defendant offered severance packages to plaintiffs and other store directors in exchange for their resignation, but plaintiffs refused. [21] ¶ 43. Defendant then transferred each plaintiff to an underperforming store to assume his new responsibilities as the sole store director at that store. [21] ¶ 53. That meant that LaRocco and Lee, who were experienced in managing drug-product operations at their old stores, had to become proficient at managing food-product operations. [21] ¶ 47. And the other plaintiffs had to make the reverse transition. [21] ¶ 48. Defendant sent all store directors training materials, but did not provide individual training sessions. [21] ¶ 142. Plaintiffs claim that the performance standards that defendant then expected its store directors to meet were unreasonably high in light of the amount of training defendant provided. [21] ¶¶ 247–49. They also allege that defendant's training practices disproportionately affected older store directors like plaintiffs, because their extensive experience managing one area of the store made them less likely to understand that managing the other area of the store might require a different approach. [21] ¶¶ 248–49.

In addition to being held to unrealistic standards, plaintiffs also suffered a series of abuses ranging from unfair criticism to excessive hours, leading them to file charges of discrimination with the EEOC and ultimately leave their stores. For

3

example, Cesario consistently received high performance ratings until the end of 2014, when a new supervisor began to reprimand him for minor issues and assigned him large-scale projects without giving him the assistance given to younger store directors. [21] ¶¶ 68, 70–73, 85. The stress he experienced led to an accident, and he went on medical leave. [21] ¶ 74. After he returned, he continued to receive criticism for trivial issues. [21] ¶¶ 77, 78. His requests for a transfer were denied, and in April 2015, he went on medical leave again due to stress. [21] ¶¶ 80, 82. He filed EEOC charges of discrimination at the end of the year. [21] ¶ 18.

Cieslak was transferred to an underperforming store in April 2011, and like Cesario, he received reprimands for minor issues in his store that did not cause concern in stores with younger store directors. [21] ¶¶ 92, 95, 98. His supervisor also denied his requests to transfer to other stores while approving similar requests from younger store directors. [21] ¶ 103. In late 2014, Cieslak complained to human resources that his supervisor had been discriminating against him based on his age, and a few months later, he received his first of several negative performance reviews. [21] ¶¶ 105–06. In June 2015, Cieslak filed a charge of discrimination with the EEOC, after which he was transferred to a smaller store. [21] ¶¶ 109–110. In December 2015, he filed an amended charge of discrimination with the EEOC and then went on medical leave. [21] ¶¶ 20, 111.

Between April 2011 and January 2013, LaRocco performed well in his new role, receiving the praise of his supervisor. [21] ¶¶ 119–21. But defendant then transferred him to an underperforming store under a new supervisor, and in June

4

2014, that supervisor began criticizing him for trivial issues and giving him negative performance reviews. [21] ¶¶ 122–23, 129. The following year, LaRocco complained about his supervisor to human resources and filed a charge with the EEOC alleging age discrimination, after which defendant terminated his employment. [21] ¶¶ 132–35.

Lee found himself in an underperforming store in April 2011 and, after improving that store's earnings, was transferred to a different store. [21] ¶¶ 145–46. After revitalizing that store, defendant transferred him to a third failing store in February 2014. [21] ¶¶ 147–49. Lee went on a medical leave of absence in July 2014, and when he returned a month later with a 40-hour-workweek restriction, his new supervisors began treating him worse than they did younger store directors. [21] ¶¶ 153–56. Five days after Lee's return, one supervisor told him it would be difficult to perform adequately while complying with his doctor's recommended 40-hour restriction, and the supervisor pressured him into deciding on the spot to either try to meet his goals or quit. [21] ¶¶ 157–58. On several occasions after that, the supervisor asked Lee to stay late in order to criticize his performance, and Lee received his first negative review in August. [21] ¶¶ 160–61. In January 2015, Lee complained about his supervisors' harassing behavior, and by March, he found his working conditions so intolerable that he left the company. [21] ¶¶ 166–68. He filed an EEOC charge of discrimination in July and an amended charge in December. [21] ¶ 27.

Defendant transferred Anderson to an underperforming store in April 2011, where he, too, received positive performance reviews. [21] ¶¶ 173–76. Five years later, he received his first negative review, after which a new supervisor began constantly criticizing his performance, setting unrealistic goals for the store, and suggesting that Anderson retire. [21] ¶¶ 183–89. Because defendant kept Anderson's store understaffed relative to other stores, Anderson ended up working more than 80 hours a week trying to meet his supervisor's expectations. [21] ¶¶ 188–89. Finding his working conditions unbearable, he left the company in November 2016 and filed an EEOC charge by the following March. [21] ¶¶ 30, 191.

Nelson enjoyed success as a store director for many years. [21] ¶¶ 219–23. But in April 2011, he was transferred to a new store and began receiving criticism for minor issues that escaped notice in stores with younger store directors. [21] ¶¶ 224–26. In November 2016, a supervisor walked through the store with Nelson, pointing out areas that she wanted changed. [21] ¶ 229. Nelson felt sick, visited the store pharmacy, and learned that his blood pressure was spiking. [21] ¶ 229. He asked for leave to go see a doctor, but his supervisor insisted that he sit down and listen to the rest of her complaints. [21] ¶ 229. He left the store in February 2017 and filed an EEOC charge in March. [21] ¶¶ 36, 237.

Like the other plaintiffs, Esboldt earned a good reputation for turning around underperforming stores. [21] ¶¶ 196–99. But in 2010, Esboldt's supervisor told him to fire two assistant store directors. [21] ¶ 202. After Esboldt refused to fire those workers, he received a slightly lower performance rating than he typically received.

[21] ¶¶ 201–03. His supervisor again suggested to Esboldt that he fire the two assistant store directors, and told him to micromanage them and document their mistakes. [21] ¶¶ 204–05. Again, Esboldt refused, and he later received his first negative performance review and a threat of termination. [21] ¶ 206. In 2016, Esboldt requested a transfer to one of the stores closer to his home and was denied; younger store directors were allowed to transfer to those stores instead. [21] ¶ 210. Also that year, an inventory audit revealed mistakes in Esboldt's store, and defendant unfairly blamed Esboldt. [21] ¶ 211. In June, Esboldt could not continue his employment under the pressure and stress of potential termination, so he left. [21] ¶ 216. He, too, filed an EEOC charge in March 2017. [21] ¶ 33.

Plaintiffs jointly bring a claim under the Age Discrimination in Employment Act based on a disparate-impact theory. Each plaintiff brings an individual claim for the intentional infliction of emotional distress. And Cesario brings a retaliation claim under the Americans with Disabilities Act. Plaintiffs also bring a variety of individual claims under the federal statutes, including disparate-treatment and retaliation claims, but those claims are not at issue in this motion.

## III. Analysis

Defendant moves to dismiss the disparate-impact claim brought by all plaintiffs (Count I), each plaintiff's state-law tort claim for the intentional infliction of emotional distress (Counts IV, VII, X, XVI, XIX, XXII, and XXV), and the retaliation claim brought by Cesario (Count III).

7

### A. Disparate Impact

In Count I of the complaint, plaintiffs invoke the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, and seek relief under a disparate-impact theory. To state such a claim, plaintiffs must allege that a "specific, facially neutral employment practice caused a significantly disproportionate adverse impact based on age." *Carson v. Lake Cty., Indiana*, 865 F.3d 526, 536 (7th Cir. 2017) (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 68 (3d Cir. 2017)) (emphasis omitted). "[I]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Defendant argues that Count I fails to state a claim because it does not adequately allege that an employment practice resulted in a statistically significant disparate impact upon older employees.

Plaintiffs argue that the practice that gave rise to their claim was the minimal training given to all store directors upon assigning them new responsibilities, which resulted in their inability to meet the performance goals set by defendant. Plaintiffs say their claim is based on the following allegations: they were all at least 56 years old and had been consistently meeting their performance goals for much of their careers; their employer instituted a policy change in 2011 to add to each store director's responsibilities the management of a different group of products, but failed to provide plaintiffs with sufficient training to perform their new duties; plaintiffs started receiving lower performance reviews and criticism,

8

and younger store directors did not receive such criticism; and after a few years, plaintiffs were either fired, constructively discharged, or went on disability or medical leave. The parties do not discuss the causal link between the minimal training and the lower performance reviews given to plaintiffs, but the complaint alleges that plaintiffs' experience with one product line blinded them to the responsibilities and requirements unique to the other product line, which made additional training necessary.

While the complaint does identify a facially neutral practice, it does not permit an inference that that practice resulted in a disparity between older and younger store directors. Defendant operated 185 stores and presumably employed at least 185 store directors to manage those stores as of April 2011. The complaint suggests that plaintiffs themselves could have benefitted from more training when they took on additional responsibilities that April, but it does not indicate the relative ages of the other store directors who were exposed to this practice, or whether the practice adversely affected anyone other than plaintiffs. Plaintiffs suggest that their own experiences are enough to show that the training protocol disproportionately affected members of their age group, but it cannot be inferred from the complaint that plaintiffs comprised the entire population, or even a substantial portion, of older store directors. As explained in *Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014), "[d]isparate-impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to support their claims," and "[a]t the pleading stage, some basic allegations of this sort will

9

suffice." *Id.* at 733. Here, however, the complaint does not allege any facts to support the claim that older employees suffered a disproportionate impact. The complaint does not allege that older people lacked the capacity to learn new skills with the training materials. Plaintiffs argue that the complaint provides defendant with fair notice of the disparate-impact claim, but it "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 728 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). For that reason, Count I is dismissed.

Defendant also argues that plaintiffs cannot bring this claim because it is outside the scope of the charges of discrimination that plaintiffs filed with the EEOC. As a general rule, a plaintiff may not bring a claim under the Act that was not alleged in his underlying EEOC charge. *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 525 (7th Cir. 2008) (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). "This requirement is to ensure that the employer has notice about the particular challenged conduct and provides an opportunity for settlement of the dispute." *Id.* But like all general rules, this one has exceptions. A plaintiff may proceed on a claim not explicitly asserted in an EEOC charge if it is "reasonably related" to the charge, and "if the claim in the complaint can reasonably be expected to grow out of an investigation of the allegations in the charge." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir. 2000) (quoting *Cheek*, 31 F.3d at 500).

Plaintiffs argue that the disparate-impact claim is reasonably related to the EEOC charges, and that each charge contains enough factual allegations from which the claim may be made. Cesario's charge states that he was discriminated

against through "unwarranted negative performance rating(s) and denial of promotion related to said performance rating(s), increased responsibilities without increased pay and/or increased support staff, failure to train and/or inadequate training, denial of transfer to another store, and comments from my supervisors related to my age." [30-1] at 2.[3] The charges filed by the other plaintiffs contain similar allegations. *See* [30-2]–[30-7]. Defendant argues that the charges describe intentional discrimination, which fits more naturally a disparate-treatment claim than a disparate-impact claim.[4]

Plaintiffs primarily rely on *Adams*, a Title VII case that also involved both disparate-treatment and disparate-impact claims. In that case, the plaintiffs alleged in both their EEOC charges and their complaint that the defendant employer's promotion process, which took into account subjective factors, resulted in a disproportionately adverse impact on a protected class. *Adams*, 742 F.3d at 731. The court explained that, in identifying an employment practice that resulted in a disparity, even though the practice was subjective and not facially neutral, the charges made clear that the plaintiffs were complaining about both disparate

---

[3] Defendant filed with the motion the charges of discrimination that plaintiffs filed with the EEOC. *See* [25-1]. Plaintiffs acknowledge that these documents are referred to in the complaint and central to its claims, and plaintiffs attach the same documents to their response to the motion. *See* [30-1]–[30-7].

[4] A claim of disparate treatment under the Act turns on the employer's intent, and the "relevant question is whether the employer's adverse employment decision was motivated by the plaintiff's age." *Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 258 (7th Cir. 1996) (citing *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545 (7th Cir. 1988)). A disparate-impact claim is not concerned with the employer's intent, and instead focuses on whether "a specified employment practice of the defendant has a disproportionately negative effect on members of the plaintiff's protected class." *Id.* (citing *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996)).

treatment and disparate impact, and that allegations of intentional discrimination did not preclude a claim of disparate impact. *Id.* at 731–33.

*Adams* is not applicable here because, as plaintiffs concede, each charge describes discriminatory conduct directed at a single individual, and the charges do not suggest the existence of a company-wide training policy, or that such a policy would have a discriminatory impact on older employees. Plaintiffs state that they were unaware of whether the complained-of conduct resulted from a policy or not, or whether any other employees were affected. But they cite no authority to suggest that their lack of knowledge excuses their obligation to give the EEOC and the defendant an opportunity to explore resolution of such a claim. Each charge alleges intentional discrimination against each plaintiff in a variety of forms, but does not identify a policy or practice that could lead to a disparate-impact claim. The claim is therefore not reasonably related to the charges. *See Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 259 (7th Cir. 1996) (explaining that a disparate-impact claim is not reasonably related to a charge of retaliation where the charge did not describe any discriminatory policies). For the independent reason that plaintiffs failed to exhaust administrative remedies for their disparate-impact claim, the claim is dismissed.[5]

---

[5] Defendant also argues that the claim is time-barred, because plaintiffs filed their EEOC charges too late. "[A]n employee may sue under the ADEA or ADA only if he files a charge of discrimination with the EEOC within 300 days of the alleged 'unlawful employment practice.'" *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). Defendant argues that the limitations period for the disparate-impact claim began to run in April 2011, when plaintiffs were assigned new responsibilities but not given the necessary training. Plaintiffs filed their EEOC charges years later, which defendant believes was too late. Plaintiffs argue that, because they were never provided adequate training, the unlawful employment practice was ongoing, and that as a result, the limitations period began to run upon the date of their termination. "Dismissing a complaint as untimely at the

## B. Intentional Infliction of Emotional Distress

Counts IV, VII, X, XVI, XIX, XXII, and XXV allege intentional infliction of emotional distress by Cesario, Cieslak, LaRocco, Lee, Anderson, Esboldt, and Nelson, respectively. As a threshold matter, defendant argues that the claim is preempted by the Illinois Human Rights Act, which provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). The Act defines "civil rights violation" to include employment discrimination based on a person's age. *Id.* 5/1-103(Q); *Id.* 5/2-102(A). But if the alleged conduct "would be actionable even aside from its character as a civil rights violation because the [Act] did not 'furnish[ ] the legal duty that the defendant was alleged to have breached,' the [Act] does not preempt a state law claim seeking recovery for it." *Krocka v. City of Chicago*, 203 F.3d 507, 516–17 (7th Cir. 2000) (quoting *Maksimovic v. Tsogalis*, 177 Ill.2d 511, 517 (1997)). In other words, "the concrete question to ask is whether the plaintiff states a valid common-law claim without needing to rely on the rights and duties created by the Human Rights Act." *Richards v. U.S. Steel*, 869 F.3d 557, 564 (7th Cir. 2017).

Defendant argues that plaintiffs' claims are all based on the same allegations underpinning their discrimination claims. The complaint does refer to the same

---

pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt.*, 559 F.3d 671, 674–75 (7th Cir. 2009). Dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts that conclusively establish that the defense applies. *Id.* On the face of the complaint, it is not obvious when the unlawful employment practice at the heart of plaintiffs' claim occurred. Thus, timeliness is not a basis for dismissal.

allegations in both the discrimination claims and the individual tort claims. But plaintiffs argue that the complaint also includes allegations that can independently support a claim for the intentional infliction of emotional distress even without incorporating the discriminatory nature of defendant's conduct. To the extent that plaintiffs' tort claims rely on the complaint's allegations of employment discrimination based on age, they are preempted and dismissed.[6] To the extent the claims are based on other allegations, they are not preempted.

Even taken as true, however, the allegations in the complaint do not support a claim of intentional infliction of emotional distress. To state such a claim, a plaintiff must allege that "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (quoting *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997)). The parties dispute only the first factor. Conduct is extreme and outrageous if it is "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 21 (1992)). But "mere

---

[6] Although defendant moves for dismissal of this claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, dismissal under Rule 12(b)(6) is more appropriate. *See, e.g., Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) (affirming dismissal of a claim on preemption grounds under Federal Rule of Civil Procedure 12(b)(6)).

14

insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not amount to extreme and outrageous conduct, nor does conduct characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Richards*, 869 F.3d at 566–67 (internal quotation marks omitted).

In the employment context, Illinois courts are hesitant to conclude that conduct is extreme and outrageous unless an "employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Richards*, 869 F.3d at 567 (quoting *Naeem*, 444 F.3d at 605). The fear is that, "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Naeem*, 444 F.3d at 605 (quoting *Graham v. Commonwealth Edison Co.*, 318 Ill.App.3d 736, 746 (1st Dist. 2000)).

Plaintiffs argue that they each alleged that their supervisors gave them unreasonable amounts of work and criticized their performance. They also argue that the complaint details particularly egregious behavior with respect to the claims of Lee, Esboldt, and Nelson. For example, Lee's supervisor unfairly blamed him for the unsatisfactory condition of his store five days after Lee had returned from medical leave. The supervisor also told Lee that he would have a difficult time performing adequately while complying with a medically-advised 40-hour workweek

15

restriction, suggested that Lee quit or retire, and told Lee to call his wife and discuss his decision to stay. Esboldt's supervisor instructed him to fire two of his assistant store directors, even though Esboldt valued their services. When Esboldt refused, the supervisor threatened to fire him and then lowered his performance rating. The supervisor also pressured Esboldt to micromanage the assistant managers until they quit. Finally, plaintiffs explain that Nelson's supervisor mistreated him while conducting an inspection of his store in November 2016. On that occasion, they walked through the store together and she identified changes she wanted made. He felt lightheaded, and he told his supervisor that his blood pressure was high and that he needed to see a doctor. Instead of permitting him to leave immediately, she made him sit down until she was finished with her critique.

Plaintiffs compare their experiences to those in *Naeem*. There, the employer's actions against the plaintiff included:

> forcing [plaintiff] to climb up an unstable metal stairway to hook up computer equipment during her pregnancy; sabotaging [her] computer to deny her access and alter her files; publicly criticizing [her] work during meetings with other supervisors; moving her office and her transportation files, causing her to be unable to locate necessary paperwork; and increasing the amount of work due . . . knowing that [she] would not be able to meet the deadlines.

*Naeem*, 444 F.3d at 606. The allegations in the complaint are not akin to the deplorable behavior described in *Naeem*. Private criticism of one's performance, even if unearned, does not rise to the level necessary to support an intentional infliction of emotional distress claim. And worse conduct on the part of employers has been held to be insufficiently extreme and outrageous. *See, e.g., Harriston v.*

16

*Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (holding that conduct was not extreme and outrageous where plaintiff was prohibited from supervising white employees, unfairly criticized, excluded from office activities and decisions, forced out of a management position and denied a promised promotion, and had her calls monitored and her car vandalized); *Tabora v. Gottlieb Mem'l Hosp.*, 279 Ill.App.3d 108, 120 (1st Dist. 1996) (affirming dismissal where plaintiff doctor alleged that the defendants engaged in a five-year campaign of harassment and intimidation by falsely claiming that he was incompetent, revoking his privileges, and constantly berating him in front of hospital staff). Plaintiffs found their supervisors' behavior offensive, and some of the allegations of defendant's treatment of plaintiffs are troubling, but they do not meet the level of objective outrageousness necessary to state a claim for the intentional infliction of emotional distress.[7] The claims are dismissed.

### C. Retaliation

In Count III, Cesario alleges that defendant retaliated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. Defendant argues that Count III should be dismissed and, rather than respond to defendant's arguments, plaintiffs request leave to replead the claim. Because plaintiffs effectively concede that Count III fails to state a claim, the claim is dismissed.

---

[7] Nelson's allegations come closer to stating a claim. "Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress." *Pilotto v. Urban Outfitters W., L.L.C.*, 2017 IL App (1st) 160844, ¶ 17 (quoting *McGrath v. Fahey*, 126 Ill.2d 78, 89–90 (1988)). Nelson's reviewer knew his blood pressure was up, yet she did not allow him to seek immediate medical attention. As currently pleaded, however, this was an isolated incident of limited duration.

Plaintiffs' request for leave to replead the claim is granted, as is their request for any dismissal to be without prejudice. Defendant requests that the claims be dismissed with prejudice, noting that plaintiffs already amended their complaint once before. *See* [18]. But the amended complaint was filed before defendant moved to dismiss, and plaintiffs should have at least one more opportunity to amend. *See Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008) ("District courts routinely do not terminate a case at the same time that they grant a defendant's motion to dismiss; rather, they generally dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint."). Also, where the basis for dismissal is a failure to exhaust administrative remedies, as is the case with the disparate-impact claim, such a dismissal should be without prejudice. *See Greene v. Meese*, 875 F.2d 639, 643 (7th Cir. 1989) ("[T]he proper remedy for a failure to exhaust administrative remedies is to dismiss the suit without prejudice, thereby leaving the plaintiff free to refile his suit when and if he exhausts all of his administrative remedies or drops the unexhausted claims.").

**IV.  Conclusion**

Defendant's motion to dismiss, [24], is granted. Counts I, III, IV, VII, X, XVI, XIX, XXII, and XXV are dismissed without prejudice. A status hearing is set for November 28, 2017 at 9:30 a.m.

ENTER:

                                                                                          _____
                                                                                          Manish S. Shah
                                                                                          United States District Judge

Date: November 7, 2017