# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TIMOTHY CESARIO, STEVE CIESLAK,
JAMES LEE, FRANK ANDERSON,
GREGORY LAROCCO, EDWARD ESBOLDT,
and LESTER NELSON,

      Plaintiffs,

      v.

JEWEL FOOD STORES, INC., et al.,

      Defendants.

No. 17 CV 319

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

All but one of the seven plaintiffs spent decades building successful careers at Jewel.[1] Timothy Cesario, Steve Cieslak, James Lee, Frank Anderson, Gregory LaRocco, Edward Esboldt, and Lester Nelson became store directors, responsible for running an entire store. A few years later, when Jewel faced financial trouble, the plaintiffs began to experience significant pressure at work. Each plaintiff claims they were eventually forced out or terminated because of their age or disability. However, despite their sweeping accusations, they each fail to present enough evidence of Jewel's discriminatory or retaliatory animus or adverse actions sufficient to support

---

[1] The complaint names as defendants three entities: Jewel Food Stores, Inc., New Albertsons Inc., and Jewel Osco Southwest LLC. Defendant Jewel Food Stores, Inc. filed the present motion, claiming that it alone was plaintiffs' employer. Plaintiffs do not address this point, and it ultimately has no bearing on summary judgment. I refer to plaintiffs' employer as "Jewel" or "defendant."

claims of discrimination or retaliation. Jewel's motion for summary judgment is granted.

## I. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. After construing all facts and reasonable inferences in favor of the nonmovants, *McDaniel v. Progress Rail Locomotive, Inc.,* 940 F.3d 360, 367 (7th Cir. 2019), the moving party must demonstrate that a reasonable jury could not return a verdict for the nonmoving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Alternatively, the moving party must show that the nonmoving parties have failed to establish an essential element of their claim and cannot carry their burden of proof at trial. *Celotex*, 477 U.S. at 323. The parties submitted one master brief, and each plaintiff submitted a supplemental brief. I review the evidence holistically. *See Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II. Background

### A. Local Rule 56.1 and Other Evidentiary Issues

Local Rule 56.1 statements are meant to streamline the resolution of summary judgment motions, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994), by requiring the parties to identify undisputed material facts. N.D. Ill. Local R. 56.1(a)(3), (b)(3)(C). Because of this important function, district courts can require

strict compliance. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (citation omitted). In a case with eight sets of briefs, judicial economy is lost with every 56.1 violation, and here, both sides burdened the court with their failure to comply with the rule.

When responding to a L.R. 56.1 statement, nonmovants must identify disagreements and, if necessary, provide a *separate* statement of additional facts. N.D. Ill. Local R. 56.1(b)(3)(B),(C). The additional facts plaintiffs include in their responses but not in separate statements are therefore stricken. Local Rule 56.1 also contains an implicit prohibition against replying to a L.R. 56.1(b)(3)(B) response. *See Johnson v. County of Cook*, 2012 WL 2905485, at *13 (N.D.Ill. 2012). Defendant's replies to plaintiffs' 56.1 responses are stricken.[2]

I disregard all improperly asserted facts and deem undisputed any facts not properly controverted. N.D. Ill. Local R. 56.1. I only address material disputes. Any unsupported facts, a number of which are in plaintiffs' response briefs,[3] are disregarded. Furthermore, L.R. 56.1 requires parties to identify each material fact— not one immaterial fact that cites to multiple material facts. N.D. Ill. Local R. 56.1(a)(3). Courts in this district have repeatedly held that parties should cite to the specific L.R. 56.1 statements of fact, not directly to the record. *See Mervyn v. Nelson Westerberg, Inc.*, 142 F.Supp.3d 663, 664 (N.D.Ill. 2015) (compiling cases). Jewel uses

---

[2] Jewel's improper replies are docket entries: [190], [193], [196], [199], [202], [205], [208], and [211]. Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of documents.

[3] *See e.g.* [186] at 1–5.

a single statement of fact—that HR lead Tim Zielinski reviewed the produced personnel files of the relevant district managers involved—to justify different facts about each district manager throughout the eight sets of briefs. [187] ¶ 40; *see e.g.* [152] at 5.[4] This is an impermissible shortcut. Jewel also relies on Zielinski's declaration, dated July 30, 2019, [146-4] at 1–4, for data about how many store directors were terminated between January 2014 and April 2017, [187] ¶ 39, and the age composition of store directors in April 2017. *Id.* ¶ 38. While Zielinski testified about his job responsibilities, it is unclear whether he relied on undisclosed personnel files for these statistical conclusions. I previously advised Jewel to not rely on unproduced documents. [86]. I strike defendant's master facts 38, 39, and 40.

The nonmovants include a post-deposition affidavit for each plaintiff.[5] Generally, self-serving affidavits are permissible on summary judgment, *Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 685 (7th Cir. 2017) (*citing Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459–60 (7th Cir. 2014)), particularly to clarify ambiguous or confusing testimony, explain newly discovered evidence, or make up for a memory lapse. *Kopplin v. Wisconsin Cent. Ltd.*, 914 F.3d 1099, 1103 (7th Cir. 2019) (citation and quotation omitted). Affidavits must always be based "on personal

---

[4] Jewel relies on fact 40, in part, to argue that district managers issued negative reviews, letters of concern, and performance improvement plans to younger store directors. *See e.g.* [144] at 24. But without more information about the substance of the evaluations, this evidence is insufficient to establish that younger store directors were similarly situated to plaintiffs. Fact 40 cites Zielinski's declaration, which contains a similar unspecific statement about reviewing records and then attaches hundreds of pages of produced personnel files, with no table of contents or appendix. [146-4].

[5] *See* plaintiffs' appendix of exhibits. [185].

knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify." Fed. R. Civ. Pro. 56(c)(4); *see also* Fed. R. Evid. 602. Personal knowledge includes reasonable inferences but excludes speculation, other intuitions, hunches, or rumors. *Widmar*, 772 F.3d at 460 (citation omitted). However, parties cannot circumvent the purpose of summary judgment "by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th Cir.1996) (collecting cases). A court may disregard new sworn testimony when it 1) contradicts that same witness's earlier sworn testimony and 2) fails to explain the contradiction or resolve any disparities. *Id.* at 1167–68. *See also Kopplin,* 914 F.3d at 1103 (citing *Bank of Illinois* and applying the sham affidavit rule).

In his answers to Jewel's interrogatories, Frank Anderson provided the names "of each individual likely to have knowledge or information" of his allegations and "each person whom [he] contend[ed] ha[d] knowledge of facts relevant to or related to" the allegations. [189-1] ¶¶ 3, 9. Answers to interrogatories are made under oath, Fed. R. Civ. P 33(b)(3), and Anderson did not identify Bill Stark, a former vice president of operations at Jewel, in his interrogatory answers. In his post-deposition affidavit, however, Anderson alleges that in the 2010–2011 time period, Stark told Anderson about Jewel's practice of "working out" employees, by pressuring them to quit, and how Jewel's buyout program targetted older store directors. [191] ¶¶ 8–13.[6]

---

[6] Comments made by Stark as an executive of Jewel, speaking within the scope of his employment, are admissible as opposing-party statements and are not hearsay. Fed. R. Evid. 801(d)(2). According to Anderson, Stark said the "working out" policy targeted older and low-rated store directors, including those placed on performance improvement plans; the policy

5

Anderson's new evidence based on Stark's comments—facts 8 through 13 in plaintiffs' master statement of additional facts—contradict Anderson's earlier sworn testimony about who had knowledge of Anderson's allegations. The facts are stricken under the sham affidavit rule, and as a sanction for plaintiffs' failure to answer under Federal Rule of Civil Procedure 37. *See Ramirez v. T&H Lemont, Incorporated*, 845 F.3d 772, 776 (7th Cir. 2016) ("Rule 37(a)(4) treats an evasive and incomplete answer in discovery as equivalent to no answer, and thus a failure to comply with court-ordered discovery.").[7]

## B. Facts

### 1. Background

In April 2011, Jewel, a grocery store chain, moved from having two store directors in each store, one responsible for food and the other for the pharmacy, to one store director responsible for both. [187] ¶¶ 1, 4, 6.[8] All the plaintiffs, Timothy Cesario, Steve Cieslak, James Lee, Frank Anderson, Gregory LaRocco, Edward Esboldt, and Lester Nelson, chose to remain, or take on, the position of store director

---

increased pressure on their performance—including more store visits and inspections by operational specialists and documenting any condition to lower their rating—effectively forcing them to quit. [191] ¶¶ 8–10, 13. Anderson also alleges that when Jewel transitioned from dual- to single-store directors, Stark told him that Jewel's buyout program targeted older store directors because Jewel did not want to lose young store directors. *Id.* ¶¶ 11–12.

[7] Because I disregard plaintiffs' new facts, I do not review Jewel's raw statistical data from 2014, 2016, or 2018. *See* [188] at 8–10. Nor do I reach the question of whether Stark's comments impermissibly alter the factual basis of plaintiffs' complaint on summary judgment. *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540 (7th Cir. 2018) (citing *Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014)).

[8] Facts are largely taken from responses to the parties' master and individual statements of material facts, where the original facts and responses are in one document.[187], [191], [180], [197], [182], [200], [176], [209], [172], [194], [178], [206], [184], [203], [174], and [212].

after this structural change. *Id.* ¶ 7. Everyone, except Nelson, had built their careers at Jewel starting in 1970s and had worked their way up to managerial positions. *See* [21].

Store directors had highly demanding jobs—the environment was fast-paced and stressful. [187] ¶ 36. Each store director was responsible for managing his entire store, which included everything from maximizing sales and earnings, hitting corporate targets, controlling costs, and minimizing inventory loss, to improving customer satisfaction and ensuring compliance with Jewel's policies. *Id.* ¶¶ 18, 21–22, 28–37. Store directors were also responsible for all employees, including training, assisting, and disciplining them. *Id.* ¶¶ 23–24. Daily tasks varied—from walking the aisles and overseeing displays of merchandise, to monitoring inventory levels and scheduling staff efficiently, to attending company trainings and meetings. *Id.* ¶¶ 22–26, 29, 33–34; [191] ¶ 14. If stores were understaffed, some store directors would take on the additional work, like restocking shelves, cleaning restrooms, and retrieving shopping carts. *Id.* ¶ 20.[9] With the demands placed on store directors, they typically worked ten-hour days, five days a week. *Id.* ¶ 15.

Store directors reported to district managers, who oversaw multiple stores in a district, and district managers reported to Jewel's vice president of operations. [187] ¶ 8. The vice president of operations issued district managers targets for enterprise-

---

[9] This statement from Anderson's post-deposition affidavit is admissible. As a store director, Anderson had personal knowledge of what store directors did during labor shortages—regardless of whether that shortage was due to a store director's mismanagement, or an actual deficiency in the budget. Jewel does not cite anything in the record suggesting that Anderson's affidavit contradicts his prior sworn testimony.

wide goals, including sales, labor, inventory loss, costs, and store conditions. *Id.* ¶¶ 9–10.[10] District managers exercised discretion on how to manage and divide these targets across the stores in their district, and allocated individual store budgets accordingly. *Id.* For example, when assigning a budget to a store, district managers considered factors like that store's performance, operations, and nearby competition. *Id.* ¶ 11.[11]

Jewel had a central department that calculated each store's labor budget based on a variety of factors, including historical data, staffing needs, and changes to the store. [185-3] at 9; [187] ¶ 12; [191] ¶ 2. A district manager could request more or less labor dollars for a particular store, and once assigned a labor budget, a store director exercised significant discretion on how and when to allocate labor dollars across departments. [185-3] at 10; [187] ¶¶ 12, 22, 26; [191] ¶ 2. Scheduling labor and

---

[10] Fact 9 is deemed admitted because plaintiffs do not support their disagreement with any citation to the record, as required by L.R. 56.1(b)(3)(B). Both parties' approach to fact 10 subverts the purpose of L.R. 56.1. Jewel combines multiple facts from four different depositions, without identifying which deposition supports each fact. [187] ¶ 10. Plaintiffs then allege multiple facts that do not create a genuine dispute or are additional facts. *Id.* The eight sets of briefs are rife with similar errors. Lawyers violate Local Rule 56.1 at their clients' peril. When a lawyer drops the ball on the rule, the client suffers because the increased burden on the court detracts from the credibility and reliability of the lawyer's entire presentation.

[11] Jewel's fact 11 is deemed admitted. Mark Laryea testified, "So there are so many different things that you actually have to consider whenever you actually do a store's budget. So as an example…," [185-2] at 13, which Jewel accurately summarized as "including but not limited to." [187] ¶ 11. Disputing 56.1 statements of fact solely because they rephrase, instead of duplicate, testimony, is frivolous. Indeed, plaintiffs' overall approach to using and citing testimony is unhelpful. Throughout the 56.1 statements, plaintiffs copy and paste significant amounts of testimony into their responses and additional facts with no quotation marks, synthesis, and little to no explanation of how the response controverts Jewel's assertion. *See e.g.* [187] ¶ 9.

managing the budget was complicated, in part because union hourly employees were guaranteed to work a minimum number of hours. [191] ¶ 3.

District managers were responsible for making sure store directors fulfilled their job responsibilities, and that all stores in their district complied with company standards. [187] ¶¶ 9, 12. To achieve these goals, district managers visited individual stores, issued letters of concern, or placed store directors on performance improvement plans. *Id.* ¶¶ 13, 15. District managers would also direct operational specialists to inspect and take photos of store conditions. [191] ¶ 16.[12] While not official policy, district managers would also take photographs of stores to document conditions, train and develop employees, or share information with the marketing department. [187] ¶ 14.

While there were standardized evaluation metrics for store directors, district managers still exercised independent judgment when completing performance evaluations for each store director. *Id.* ¶¶ 16–17.[13] For the midyear and annual evaluations of store directors, district managers attended group meetings run by Jewel's vice president of operations and human resources department to discuss the store directors and rank each one according to a nine-tier rating system. [191] ¶¶ 4–

---

[12] A witness's failure to recall ever seeing good pictures of plaintiffs' stores, standing alone, cannot be used to infer no good photos were ever taken and is therefore immaterial. [191] ¶ 19.

[13] Plaintiffs' master additional facts 17 and 18 are also about the evaluation process. [191] ¶¶ 17–18. However, they are disregarded because the cited pages 114 and 174 of Brushenko's deposition are not in the record. *See* [185] and [146-5] at 67–79. These two facts do not affect the outcome of the case because the parties already agree district managers exercised some discretion in their evaluations of store directors and that scheduling labor was complex, in part because of the contractual guarantees to hourly union workers.

5.[14] Jewel's president often attended these meetings. *Id.* ¶ 4. The nine categories reflected levels of competence, with various pathways between each category for a store director to advance, regress, or plateau. *Id.* ¶¶ 6–7; [185-26] at 2. "Nine" was the lowest rating and signified the employee was on a performance improvement plan ("PIP"). [191] ¶ 7.

In 2013, when New Albertsons purchased Jewel, Jewel's financial future was precarious, and the company relied on individual store profits to remain viable. *Id.* ¶ 1. It was during or after this time of stress that all the plaintiffs began experiencing serious problems at work.

### 2. Timothy Cesario

Throughout 2014, Timothy Cesario, who was born in 1955, and all the store directors in his district were under increased pressure from their district manager, Mark Laryea,[15] to improve customer satisfaction and store metrics. [180] ¶¶ 1, 12. In November 2014, Laryea requested that Cesario revamp the produce and farm stand departments and make other improvements. *Id.* ¶ 15. After inspecting Cesario's work, Laryea told Cesario, "you can't handle the store." *Id.* ¶ 17. The parties dispute whether Laryea asked Cesario, "How old are you?" and "How much longer do you plan on doing this?" [197] ¶ 7. That same month, Cesario injured his back from falling

---

[14] Human resources manager Rebecca Young testified that district manager meetings about store directors using the 9-tiered rating system were "similar" to store director meetings about store personnel, which used the same rating system. [185-4] at 19. Jewel fails to raise a genuine dispute that fact 5 relates "to entirely different meetings." [191] ¶ 5.

[15] The parties spell Laryea's last name "Layrea" and "Laryea" throughout the filings. Mr. Laryea spells his last name L-a-r-y-e-a. [185-2] at 3.

down the stairs at home and took medical leave from November 2014 to early January 2015. [197] ¶ 21; [185-10] at 56.[16]

On the day Cesario returned to work, Jewel's president Mike Withers visited Cesario's store and critiqued store conditions. [180] ¶ 30. Cesario believes Withers's visit was in retaliation for Cesario taking medical leave during a busy time of the year. [197] ¶ 15. Withers returned to Cesario's store in March 2015. [180] ¶ 32. That same month, Laryea issued Cesario a letter of concern for poor store conditions, including cleanliness issues. *Id.* ¶ 19. A few days later, Laryea emailed ten of his store directors, including Cesario, about missing their payroll rate and needing to make sales and labor adjustments. *Id.* ¶ 21. Two days later, Laryea emailed all his store directors, expressing concerns about a decline in store conditions. *Id.* ¶ 22.[17] In early April, Laryea emailed all the store directors again about store conditions. *Id.* ¶ 23.

During this period of increased pressure, Cesario struggled to meet expectations, in part because of his labor budget, which made it difficult to schedule employees and not violate contracts that guaranteed union employees a minimum number of hours. [197] ¶¶ 5–6.

---

[16] Cesario's allegation that he fell at home due to work stress is speculation in light of his testimony that he suffered from various medical conditions, and therefore inadmissible. [185-10] at 56.

[17] Plaintiffs object to this fact based on "foundation, materiality, and relevance" and argue "the email is not specifically directed at Cesario." [180] ¶ 22. For paragraph 22, Jewel cites Cesario's own deposition testimony to support this fact. Cesario laid foundation for the email, testifying that he received it and forwarded it to his wife. [185-10] at 37. The email is material and relevant to determining whether Laryea's conduct was motivated by Cesario's age or other reasons. Although the email was not specifically directed at Cesario, his own testimony confirmed that the email was to all of Laryea's store directors, including him. *Id.* Cesario's objections to facts 22 and 23 are representative of plaintiffs' shoddy disregard for L.R. 56.1— the objections are frivolous and overruled.

On April 14, 2015, Laryea issued Cesario another letter of concern about poor store conditions, which incorporated Withers's concerns from a store visit Withers had made that same day. [180] ¶¶ 24, 31; [185-10] at 41. Laryea and Cesario met to discuss Cesario's performance, but the parties dispute what was said, including whether Cesario requested a transfer. [180] ¶¶ 25–26. That same day, Cesario took medical leave and has yet to return to work. *Id.* ¶ 34; [185-10] at 45.[18] Jewel accommodated his time off and request for disability. [180] ¶ 35. At no point was Cesario put on a PIP, denied a promotion, or compensation. *Id.* ¶¶ 27, 29. During the relevant time period, Cesario never received a rating below a 3 out of 5. *Id.* ¶¶ 4–6, 8. Cesario does not allege that younger store directors received higher ratings than he received. [197] ¶¶ 9–10.

The Equal Employment Opportunity Commission received Cesario's first charge on December 4, 2015, and an amended charge later that month. [30-1].[19]

---

[18] The parties dispute whether Laryea and Withers caused Cesario to take medical leave. [197] ¶ 18.

[19] In a post-deposition affidavit, Cesario claims he was initially replaced by a younger store director who used more labor dollars. [197] ¶ 16. Cesario lacks personal knowledge and relies on inadmissible facts—an unproduced document and "conversations with people in the store." [197] ¶ 16; [185-10] at 52–54. Additional fact 16 is inadmissible. In the same affidavit, Cesario generally alleges that in the 1990s he became aware of Jewel's "working out" policy, whereby the company put extreme pressure on less desirable employees and transferred them to "smaller, less productive" stores, and that this practice was amplified in 2013 when New Albertsons bought Jewel. [197] ¶¶ 2, 5–6. Cesario also states that in the late 1990s and early 2000s, he was directed by a district manager to "work out" employees. *Id.* ¶ 2. The record is devoid of evidence that, directly or by inference, connects these dated statements to Laryea's and Withers's actions in 2014 and 2015. These additional facts require a speculative inference to be connected to Cesario's treatment, and they are inadmissible. *See Johnson v. Rimmer*, 936 F.3d 695, 706 (7th Cir. 2019) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion") (internal citation and quotation omitted).

### 3. Steve Cieslak

Steve Cieslak, born in 1960, became a store director in April 2011 at the Archer and Western store. [182] ¶ 4. At this location, he initially reported to district manager Dave Negron, and then to Steve DeSantiago. *Id.* ¶ 5. At some point, in or before 2013, Negron told Cieslak that the company did not value tenured managers or being an aged company, a sentiment that DeSantiago echoed. *Id.* ¶¶ 19–21; [185-13] at 60.[20] In 2014, DeSantiago rated Cieslak a 3 out of 5 but placed Cieslak in a "watch box." [200] ¶ 1; [185-13] at 30. DeSantiago told Cieslak that HR pressured DeSantiago to rate Cieslak poorly. [200] ¶ 1; [185-13] at 30.[21]

In spring 2014, Cieslak began reporting to Laryea. [182] ¶ 6. Cieslak's store started experiencing more visits by operational specialists and Laryea. [200] ¶ 4.[22] In September 2014, Laryea emailed all of his store directors, including Cieslak, that Laryea had lost patience and trust because store directors were not executing basic tasks and achieving targets. [182] ¶ 28. In November 2014, Laryea placed Cieslak on

---

[20] DeSantiago's and Negron's statements are admissible as party-opponent statements and not hearsay. Fed. R. Evid. 801(d)(2); *see Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822–23 (7th Cir. 2011) (to qualify as an agent of the opposing party, an employee's "duties must encompass some responsibility related to the decision-making process affecting the employment action") (internal citation and quotation omitted).While their comments may not be actionable because they fall outside of the limitations period, they serve as relevant background evidence.

[21] This statement is admissible as a party-opponent statement. Fed. R. Evid. 801(d)(2).

[22] The statements of the operations specialists to Cieslak are inadmissible hearsay and therefore disregarded. Plaintiffs have not established that the specialists were speaking within the scope of their employment or responsibilities when they purportedly told Cieslak that he had a target on his back. Not all office gossip within the workplace is attributable to the employer as a non-hearsay admission.

his first PIP, and Cieslak felt pressured to resign. [200] ¶ 16.[23] Sometime that year, Cieslak also complained of age discrimination to Laryea. [182] ¶ 17. In January 2015, Cieslak was placed on another PIP. *Id.* ¶ 13. That same month, Cieslak reported age discrimination to HR. *Id.* ¶ 17. In May 2015, Cieslak was placed on a PIP again. *Id.* ¶ 13.

At some point, Cieslak asked Laryea if he could transfer to a store that was profitable and closer to home. *Id.* ¶ 8. Laryea agreed, if Cieslak made his quarterly budget. *Id.* ¶ 7. In the meantime, Cieslak struggled to operate his store, because he required more labor and was experiencing increased scrutiny of his operations, including frequent photo documentation. [200] ¶¶ 8–9, 11. Cieslak believes that after challenging Laryea in a payroll labor meeting, Laryea retaliated against him by decreasing his store budget. *Id.* ¶ 10; [185-13] at 93.

Over the course of 2015, Cieslak worked 65 to 70 hours a week. [200] ¶ 3. He saw younger store directors being transferred. *Id.* ¶¶ 7, 18.[24] Cieslak had personal knowledge of Nisa Stewart's, Kevin Derrico's, Keith Murray's, Dennis Valentine's, and Hollie Abernathy's store conditions. [185-13] at 73, 76; 84–91.[25] In June 2015,

---

[23] While Jewel disputes this statement, it fails to provide specific references to the record that show how this fact violates the sham affidavit rule or any discovery rule. Additional fact 16 is deemed admitted as a party-opponent statement. While plaintiffs cite to the wrong portion of Cieslak's declaration for this fact—the correct citation should be [185-12] at 9—I overlook this transgression because it is insignificant. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (district courts may overlook local rule transgressions, as long as the rules are not being enforced or relaxed unequally between the parties).

[24] [185-12] at 4 is the correct underlying citation for additional fact 18.

[25] Cieslak heard about the performance ratings of younger store directors Jose DeJesus, Keith Murray, and Mino Clemente, and of Murray's, Clemente's, Stewart's, and Lisa Kloc's PIPs

Cieslak called Jewel's ethics hotline and filed his first EEOC charge, which was received on June 26, 2015. [185-14] at 10; [182] ¶ 22; [30-2] at 1. In July, Cieslak was transferred to the Oak Park store, replacing Abernathy as store director. [182] ¶¶ 4, 24. The transfer cut Cieslak's commute by half, *id.* ¶ 4, but did not meet Cieslak's request for a profitable store. [185-13] at 12. The transfer did not change Cieslak's compensation but may have affected his bonus structure. [182] ¶ 8; *see e.g.* [184] ¶ 27. Sometime in August 2015, Cieslak again complained of age discrimination to HR. [185-13] at 77; [182] ¶ 17. Meanwhile, Cieslak's performance improved, and he was removed from the PIPs in December 2015. *Id.* ¶ 14. That same month, he filed an amended charge with the EEOC. *Id.* ¶ 22. Jewel investigated all of Cieslak's complaints. *Id.* ¶ 18.

In approximately August 2016, Maria Brushenko became Cieslak's district manager. *Id.* ¶ 15.[26] Brushenko never threatened to terminate Cieslak. *Id.* In October 2016, Cieslak took medical leave. *Id.* ¶ 11. He was exhausted and felt he had hit "a breaking point." [185-13] at 79-80; [200] ¶ 5. In December 2016, Cieslak filed a second amended charge with the EEOC. [182] ¶ 22. He is still on medical leave. *Id.* ¶ 11. At no point was Cieslak's salary reduced. *Id.* ¶ 12.[27]

---

because they told him. [185-13] at 49, 76. This evidence is disregarded as inadmissible hearsay.

[26] Sometime in 2016, Cieslak alleges that Laryea approached other employees to learn information about Cieslak that would allow Laryea to terminate him. [200] ¶¶ 2, 12. Cieslak's knowledge of this is based on inadmissible hearsay and therefore disregarded.

[27] In a post-deposition affidavit, Cieslak alleges that he was aware of a "working out" process at Jewel since the 1990s, whereby supervisors created intolerable working conditions for targeted employees so they would quit. [200] ¶ 13. In 2007, Cieslak was instructed to "work out" an employee by documenting all of the employee's errors. *Id.* ¶ 14. While at the Archer

### 4. James Lee

In April 2011, James Lee, born in 1957, became the store director at Jewel's Oak Park store. [176] ¶¶ 1, 7. Lee worked long, grueling hours. *Id.* ¶ 8. In January 2012, Lee's district manager Ron Harris issued Lee a letter of concern because Lee's store had failed an audit. *Id.* ¶ 15. Nevertheless, for the February 2012 to February 2013 review period, Lee was rated a 3 out of 5. *Id.* ¶ 13. In July 2012, in the middle of the review period, Lee transferred to Jewel's store in Downers Grove, where he served as store director until late January 2014. *Id.* ¶¶ 7, 11. Lee then moved in January 2014 to a store in Chicago on Pulaski Road and received a premium for working at an "operationally challenged" store. *Id.* ¶¶ 7, 12. For the February 2013 to February 2014 review period—which included Lee's time at both Downers Grove and Pulaski Road—his district manager, DeSantiago, rated Lee a 2 out of 5. *Id.* ¶ 14. Lee disagreed with the rating. *Id.*

In mid-June 2014, Lee took medical leave for anxiety, which was recommended by his counselor from Jewel's employee assistance program. *Id.* ¶ 19; [185-21] at 49. While out on leave, Lee alleges Jewel owed him a bonus. [209] ¶ 11.[28] In mid-July,

---

and Western store, Cieslak claims he observed another employee being "worked out." *Id.* ¶ 15. These three additional facts are inadmissible, either because they lack factual support or are based on inadmissible hearsay. Furthermore, this evidence is temporally too distant to infer that Cieslak experienced age-based discrimination during the actionable time period. *See Staples v. Pepsi-Cola General Bottlers, Inc.*, 312 F.3d 294, 301 (7th Cir. 2002) (alleged comments made two and four years earlier are "too distant temporally to provide support of alleged discrimination.").

[28] This issue was explored during Lee's deposition. *See e.g.* [185-21] at 59, 75. Jewel was not surprised by this allegation in the summary judgment facts. While plaintiffs' citations are wrong, in violation of L.R. 56.1, I overlook this transgression because this fact concerns a potentially adverse action that Jewel has been on notice of since Lee's EEOC filing, [21] at 22, and was explored during discovery. *See e.g.* [185-21] at 59.

Lee returned to work with multiple restrictions, including a 40-hour work week and no more than eight hours a day, which Jewel accommodated. [176] ¶¶ 19–20. His new district manager, Laryea, violated these restrictions on three occasions, and Lee had to work an additional 15 to 45 minutes each time. *Id.* ¶ 23.

In August 2014, Lee was placed on a PIP because of his 2 rating for the 2013–2014 review period. *Id.* ¶ 16.[29] In early August, the City of Chicago issued Lee's store a citation for multiple municipal code violations, including expired food product. *Id.* ¶ 17.[30] Laryea issued Lee a letter of concern regarding product worth $3,000 that was out of code. *Id.* In late August, Laryea issued Lee another letter of concern for poor store conditions. *Id.* ¶ 18.[31] At the end of August, Lee took a second medical leave for a shoulder injury. *Id.* ¶ 24; [209] ¶ 10. He returned to work in January 2015, under a new district manager Adam Ruiz, with restrictions, including a 45-hour work week and no use of his left arm. [176] ¶ 24. No violations of these accommodations are alleged. *Id.* ¶ 25.

On January 8, 2015, Lee emailed an HR representative about his concerns regarding comments made by an operations specialist and his former district

---

[29] Plaintiffs' objections to Exhibit 11 are overruled: Lee confirmed his signature on the document in the cited testimony, [185-21] at 58, and the remaining objections do not actually controvert fact 16.

[30] Plaintiffs' attempt to dispute this fact includes uncited facts and does not actually controvert the substance of fact 17 and is therefore disregarded. This is an example of a common error plaintiffs make.

[31] Plaintiffs do not dispute fact 18 but rather include an additional fact in the response, in violation of L.R. 56.1.

managers Laryea and DeSantiago. *Id.* ¶ 26.[32] According to the email, the day Lee returned from medical leave, an operational specialist congratulated Lee for working at Jewel for 35 years, asked him how many more years he was going to work, and stated "well you missed the holidays so let's take a look around the store and see what is happening now." *Id.* ¶ 27. Lee's email also stated that in July 2014, over one or two conversations, Laryea asked Lee about quitting and made comments like, "you had to have thought about retiring" while on leave and "why don't you just retire and make it easy," and when Lee responded that he would have to speak with his wife, Laryea slid his phone across to Lee and said to call her. *Id.* ¶ 28. Prior to that, DeSantiago asked Lee why he did not take the buyout in 2011 when Jewel transitioned to the single-director format. *Id.* ¶ 31. At some point another district manager, Negron, asked Lee the same question. *Id.* ¶ 35. Lee submitted two statements related to his concerns. [209] ¶ 13. Jewel investigated the complaint. [176] ¶ 29.

After this email, Jewel's president Mike Withers visited Lee's store and was critical of the store and committed to visiting regularly, describing it as his "new favorite store." *Id.* ¶ 33. While Withers did not visit again before Lee's resignation, *id.* ¶ 34, Lee felt more pressure, as his store experienced an increase in visits from operational specialists and Ruiz. [185-21] at 87–88; [209] ¶ 19. He was worried about

---

[32] Jewel misspells DeSantiago's last name. Generally, the parties' briefs contain many spelling inconsistencies of district manager names—yet another example of how sloppiness undermines lawyers' credibility and burdens the courts with the time spent to identify the cast of characters.

working long hours and the related stress. *Id.* ¶ 21. Lee resigned from Jewel on March 16, effective March 28, 2015. [176] ¶¶ 2, 36.[33] On March 21, 2015, Lee emailed Ruiz, thanking Ruiz for boosting his confidence, which helped Lee "make my choice on my terms," and explaining that he could not meet "the demands of this job and the needs of my family at this time." [176] ¶ 37; [146-3] at 269. Lee does not allege Ruiz discriminated against him: "I had no complaints about the time I worked with Abram," he said. [176] ¶ 39.[34] The EEOC received Lee's first charge on July 30, 2015, and an amended one in December 2015. *Id.* ¶ 3. In his amended charge, Lee stated the discriminatory conduct occurred from March 2014 to March 28, 2015, and marked the "continuing action" box. [30-4] at 2.[35]

---

[33] Fact 2 is one sentence; plaintiffs' dispute of it takes up 2/3 of the page. [176] at 2–3. Plaintiffs use blocks of testimony with no quotation marks, context, or relevant editing. And ultimately, no part of plaintiffs' response contravenes Jewel's fact. Fact 2 is deemed admitted.

[34] None of plaintiffs' dispute controverts Jewel's fact, so fact 39 is deemed admitted. In his response brief, Lee also writes, "From January 2014 to February 2014, Lee had no complaints working for Ruiz. Compared to the hostile work environment Lee was subjected to under both DeSantiago and Laryea, DM Ruiz was someone Lee felt he could work for." [175] at 3–4.

[35] Some additional facts that rely on Lee's post-deposition affidavit have been disregarded. Lee's familiarity with the "working out" policy in the mid-2000s, including being directed to "work out" certain employees, without more, is mere speculation and disregarded. [209] ¶ 1. So are his general, unsupported allegations that younger store directors worked at "more advantageous stores." *Id.* ¶ 9. The information Lee learned from his assistant store director is also inadmissible hearsay. *Id.* Lee's claim that DeSantiago and Negron made comments about tenure and seniority are stricken under the sham affidavit rule, as inconsistent with Lee's prior testimony about which comments formed the basis of his age discrimination claim. *Id.* ¶ 2; [185-21] at 87. Finally, Lee states that he complained to DeSantiago and Laryea about the size of his labor budget and the difficulties Lee had scheduling employees with the union contract requirements. [209] ¶ 18. These new statements do not contradict Lee's prior sworn testimony about working conditions. However, Lee did not mention these complaints when asked about the basis of his age discrimination claim, [185-21] at 87, so he cannot use this new evidence to allege age discrimination. The comments are disregarded.

### 5. *Frank Anderson*

From 2014 to 2016, Frank Anderson, born in 1958, worked as many as 12 to 13 hours a day, seven days a week. [172] ¶ 1; [185-6] at 37; [194] ¶ 13.[36] In the second quarter of 2015, Anderson requested a lateral transfer to a non-operationally challenged store. [185-6] at 37, 56. He made the same request again in mid-May 2016. [172] ¶¶ 18–19. While there are some disputes, the parties agree that Anderson's district manager Brad Boyle told Anderson that Jewel's vice president of operations did not like moving store directors; that Boyle expressed some concern about Anderson retiring if he was transferred; and that Boyle believed Anderson could retire because of Anderson's real estate investments. *Id.* ¶¶ 19–20; [185-6] at 38.

In June 2016, Boyle emailed Anderson requesting that Anderson cut labor, which Anderson refused to do. [172] ¶ 21. The next day, Boyle came into Anderson's office and said, "how dare you disrespect me?" and told Anderson, "I was supporting you in the beginning, but this is it. I'm going to make sure I fire you if it's the last thing I do." *Id.* There is no dispute that Boyle's threat was triggered by their labor disagreement. [194] ¶ 7; [185-6] at 35. After that, Boyle transferred younger store directors, but not Anderson, to other stores. [172] ¶¶ 22–23. Around this time, Anderson's requests for more labor were denied, and he saw an increase in operational specialists inspecting his stores and taking photos. [194] ¶¶ 9, 11.

---

[36] The number of 56.1 violations in the submissions about Anderson—like impermissible additional facts, facts based on inadmissible evidence or speculation, incorrect citations, improper and frivolous disputes—are too many to address individually. I disregard all improperly asserted facts and deem undisputed any facts not properly controverted. N.D. Ill. Local R. 56.1.

Anderson met his new district manager, Laryea, in September 2016. [172] ¶ 26. At their first meeting, Anderson told Laryea, "Well, I heard you like to sneak in and out of stores at all times of day and night. I heard that you term'd a lot of our store directors in your past district. I heard that you like to give out lots of assignments when it comes to district meetings to compare." [172] ¶ 27; [185-6] at 40–41.[37] Anderson also made some other comment that potentially undermined Laryea's authority. [172] ¶ 28. Laryea asked Anderson about his age and how long he was going to work and laughed at Anderson's response. [185-6] at 42.[38]

In November 2016, Laryea asked Anderson about his retirement date, multiple times, because Laryea was "hearing all over the street" that Anderson was retiring soon, and that "[v]endors and everybody [were] talking about it." [185-6] at 45; [172] ¶¶ 32–33. Laryea frequently took pictures of Anderson's store, which contributed to Anderson's paranoia that he was going to be fired. *Id.* ¶¶ 35–36.

In December 2016, Anderson submitted his letter of resignation. *Id.* ¶ 35. He felt "forced out" and was emotionally and physically distressed. [194] ¶ 18; [185-6] at 46–47. Nevertheless, in his resignation letter, which he wrote at home, Anderson thanked the company for "the numerous opportunities" he received and the

---

[37] Laryea's inability to recall Anderson's statements does not controvert Anderson's testimony. Anderson testified under oath that he made these comments. [185-6] at 40–41. Jewel's fact 27 is deemed admitted.

[38] While the supporting factual citation is off by one full page (or three quarter-deposition pages), *see* [194] ¶ 12, Anderson's deposition testimony does support this opposing-party statement. [185-6] at 42.

"wonderful people" he worked with. [172] ¶ 34; [185-6] at 47. Anderson then filed his EEOC charge, which was received on March 20, 2017. [30-5] at 1.

During his time at Jewel, Anderson had never performed below a "satisfactory" rating or been placed on a PIP. [172] ¶ 31.[39] There is no evidence about Anderson's replacement.[40]

### 6.    *Gregory LaRocco*

Gregory LaRocco, born in 1955, worked as a store director at Jewel for over thirty years. [178] ¶¶ 1–2. In approximately 2010 or 2011, LaRocco moved to an "operationally challenged" store in DeKalb, Illinois. *Id.*; [206] ¶ 4. LaRocco personally believed this transfer was a demotion based on his age. *Id.* ¶ 5. In 2012 and 2013,

---

[39] According to the amended complaint, DeSantiago rated Anderson a 4 out of 5 (consistently meets and exceeds expectations) in May 2012 and May 2013. [21] ¶ 177.

[40] Some additional facts that rely on Anderson's post-deposition affidavit are disregarded. Anderson claims that he witnessed age discrimination at the direction of Jewel's VP of operations, which included giving younger store directors better store locations, labor budgets, and reviews. [194] ¶¶ 1–3. This was part of Jewel's "working out" process, which required making employees so miserable that they quit on their own accord, and Anderson refused to participate. *Id.* ¶¶ 4–5. As discussed above, these facts are disregarded under the sham affidavit rule and as speculation or conjecture when used to infer the truth of plaintiffs' claims. Anderson also alleges that another employee, a market operational specialist, told him that Laryea was building a case to terminate him. [194] ¶ 14. This is inadmissible hearsay. And plaintiffs' citations for this fact are also incorrect. (They should be [185-6] at 57.) Finally, Anderson claims Laryea teamed up with the HR department to push Anderson out. [194] ¶ 15. But the citations to the record do not support the allegation that the HR representative made any threats or shared Laryea's motivations. Anderson testified that the HR representative said, "Well, you know what Mark is not going to let up until you give him what he wants," and then acted as a middleman between Laryea and Anderson about Anderson's retirement date. [185-6] at 46. This additional fact is disregarded.

LaRocco's district manager Brad Boyle rated LaRocco's performance a 3 out of 5. *Id.* ¶ 20.

From 2013 onwards, LaRocco reported to district manager Phil Romanello. [178] ¶ 3. Romanello would visit stores, participate in physical inventories, and photograph store conditions. *Id.* ¶ 31. Romanello's practice of photographing conditions was new to LaRocco. [206] ¶ 14. On June 30, 2014, Romanello placed LaRocco on a PIP based on concerns with LaRocco's store conditions. [178] ¶ 4. LaRocco disagreed with Romanello's assessment and did not sign off on the evaluation. [206] ¶ 15. During a meeting to discuss the PIP, LaRocco indicated he planned to work five to six more years, to which Romanello responded "that's doable." [178] ¶ 12; [185-18] at 22; [206] ¶ 7. In December 2014, LaRocco achieved a satisfactory rating of 3 out of 5. [178] ¶ 8. The parties dispute why LaRocco's rating improved. *Id.* ¶ 9.

LaRocco worked long hours and struggled to manage his labor budget because of the requirement to give a certain number of hours to union employees. [206] ¶ 6.[41]

_____

[41] LaRocco's statement about requesting more labor in additional fact 6 is disregarded under the sham affidavit rule. LaRocco initially testified that he "never requested" additional labor above and beyond the labor budget, [185-18] at 23–24, which directly contradicts his new sworn testimony that he "always requested more people." [206] ¶ 6. While LaRocco's statement that Romanello told him to "figure it out" in response to LaRocco's complaints about the labor budget is admissible as a party-opponent statement, *id.*, LaRocco's introduction of this new evidence post-discovery—that LaRocco complained to Romanello about his labor budget and Romanello's response—circumvents plaintiffs' duty to disclose under Federal Rule of Evidence 37 and unduly prejudices and surprises Jewel, which had no opportunity to respond to these allegations during discovery. These facts are therefore disregarded. *See Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th 2019) (listing factors for making Rule 37 determinations: 1) the prejudice or surprise to the party against whom the evidence is offered; 2) the ability of the party to cure the prejudice; 3) disruption to the trial; 4) bad faith or willfulness).

LaRocco believed Romanello was targeting him, and that Romanello's treatment of him was unfair, and that the stress he experienced at work resulted in his depression and anxiety. *Id.* ¶ 10.[42]

During a meeting between Romanello and LaRocco on February 25, 2015, LaRocco said he had "a lot going on" and "did not know how other people were getting the job done." [178] ¶ 10.[43] Romanello suggested alternative positions at the company to reduce LaRocco's stress. *Id.* ¶ 11.[44] On May 29, 2015, Romanello downgraded LaRocco's rating to 1 out of 5 and issued LaRocco another PIP. *Id.* ¶¶ 13–14. LaRocco disagreed with the rating. [206] ¶ 16. Nevertheless, he submitted improvement goals as part of the PIP process. [178] ¶ 16. Romanello also provided additional support by walking through LaRocco's store with him, assigning LaRocco a "buddy" store director, and giving LaRocco better department managers. [178] ¶ 17.[45] However, in a post-deposition affidavit, LaRocco alleged that from 2014 onwards, he was not

---

[42] LaRocco's testimony about his own state of mind is admissible, although he is not competent to diagnose the cause of depression and anxiety. I address LaRocco's evidence about the "working out" theory below.

[43] Plaintiffs' response only includes additional facts and therefore fails to properly controvert Jewel's fact 10.

[44] LaRocco fails to properly dispute defendant's facts 10 and 11; LaRocco responded "yes" when asked if Exhibit 17 was accurate. [185-18] at 28–30.

[45] Plaintiffs dispute this fact by claiming "[t]he alleged testimony is not found at the given citation." [178] ¶ 17. Not so. The cited testimony is Romanello stating that, "I walked Greg through his store at numerous times of the day on many occasions to get him into a routine. I assigned him a buddy store director….[I assisted by getting] operations specialists to help him…teaching department managers, and helped him with scheduleding…I supported him with better department managers." [185-3] at 30. One is left to wonder if plaintiffs' counsel intentionally submitted a false statement to the court. Additionally, LaRocco's post-deposition statement, [206] ¶ 21, does not controvert the fact that Romanello assigned LaRocco a buddy—in fact it confirms that Romanello did give LaRocco another store director to contact. The statements of LaRocco's "buddy" are inadmissible hearsay.

"given better department managers" and that his experienced managers were replaced with less experienced ones. [206] ¶ 4.[46] On that same day, May 29, 2015, LaRocco complained to HR that he felt threatened by Romanello but did not allege age discrimination. [185-18] at 56; [206] ¶ 9; [178] ¶ 34. The parties dispute whether Romanello, when downgrading LaRocco, told him that his "decision should be job or no job." *Id.* ¶ 34; [206] ¶ 9.

In June 2015, LaRocco did not inform Romanello in a timely manner that his store had successful recalled coleslaw. [178] ¶ 18. That month, LaRocco's store was the only one that failed to key in milk inventory. *Id.* ¶ 19.[47] On June 20, 2015, LaRocco emailed HR asking whether other stores were being equally scrutinized. [206] ¶ 11.[48]

LaRocco filed his first charge with the EEOC, which was received on August 6, 2015, while still employed by Jewel. [178] ¶ 35; [30-3] at 1. LaRocco believed the age discrimination he experienced resulted from a directive by Jewel executives. *Id.* ¶ 27. The parties dispute whether and who in HR was aware of LaRocco's EEOC charge prior to LaRocco's termination. [206] ¶¶ 18–19. On August 17, 2015, Romanello rated LaRocco a 1 out of 5 and decided to terminate LaRocco that same day. [178] ¶¶ 20–

---

[46] While this statement contradicts Romanello's testimony, it does not contradict LaRocco's testimony under the sham affidavit rule. Self-serving affidavits are permissible. *See Whitaker*, 849 F.3d at 685.

[47] Plaintiffs dispute fact 19 by saying LaRocco's "store was late in responding to the communication that we had pulled it, but it was pulled immediately." [178] ¶ 19. However, LaRocco gave this testimony in response to a question about a salad recall, not the milk inventory. [185-18] at 47. Again, at some point the sloppiness by plaintiffs' counsel starts to look like intentional deception.

[48] LaRocco's testimony that other employees, including his assistant director Greg Jaeger, believed Romanello was targeting LaRocco because of his age is disregarded as inadmissible hearsay. [206] ¶ 13.

23. Romanello was not aware of the EEOC charge, and LaRocco testified that Romanello did not discriminate against him based on age.[49] [185-18] at 54; [178] ¶ 36.[50]

### 7. Edward Esboldt

During his time at Jewel, Edward Esboldt, born in 1960, worked at both "operationally challenged" stores and more profitable ones. [184] ¶¶ 23–24.[51] The stores had different premium and bonus structures. *Id.* ¶ 27; [185-16] at 23. Esboldt

---

[49] The fact that an HR representative was involved in both the termination process and the review of LaRocco's EEOC charge does not controvert Jewel's factual statement that Romanello alone made the decision to fire LaRocco and was personally unaware of the EEOC charge.

[50] As with the other plaintiffs, some additional facts that rely on LaRocco's post-deposition affidavit have been disregarded. Like the other plaintiffs, LaRocco states that beginning in 2011, HR and district managers told him about the "working out" policy, which required building a record of poor performance that would lead to the employee's termination. [206] ¶ 2. The record is devoid of evidence that, directly or by inference, connects these dated and conclusory statements to Romanello's actions from 2013 and onwards. This additional fact is speculative and therefore inadmissible. *See Johnson*, 936 F.3d at 706. In 2012, 2013, 2014, other store directors and employees told LaRocco about Jewel's directive to "work out" older store directors because of their age. [206] ¶ 3. This evidence is based on inadmissible hearsay and disregarded. (These employees were not involved in the decision-making process concerning LaRocco's alleged adverse actions and therefore were not speaking within the scope of their agency relationship with Jewel. *See Makowski*, 662 F.3d at 822–23.) LaRocco understood PIPs to be a part of the "working out" process based on "common knowledge at Jewel." [206] ¶ 15. Without more, this testimony is mere speculation and disregarded. Finally, LaRocco alleges that younger store directors—Dennis Gorski, Allen Anderson, Kim Palmer, Jason Zimanek, and Katheryn Hanus—received more assistance than he received, and maintained the same or worse conditions (but under less scrutiny). *Id.* ¶¶ 12, 17. Some of these facts are based on inadmissible hearsay, including any information provided by LaRocco's former assistant store director about Zimanek, [178] ¶ 32, and the rest is without foundation to be anything but speculation.

[51] The 56.1 statements about Esboldt lack dates and fail to establish a clear chronology.

received premiums for working at "operationally challenged" stores. [184] ¶ 27. Older and younger store directors received bonuses. *Id.* ¶ 16.

At some point, likely in or before 2013,[52] Esboldt heard district manager DeSantiago say "longevity isn't a factor and it isn't going to save anyone's job" at a store director meeting. [203] ¶ 3; [185-16] at 45–46. Esboldt heard the same statement made by district manager Negron when Esboldt moved districts. [203] ¶ 3; [185-16] at 45–46.

When Ken Dion became Esboldt's district manager, Dion would critique and reprimand Esboldt about store conditions. [184] ¶ 8. Esboldt thought some of Dion's comments were excessive and unwarranted. *Id.*; [185-16] at 33. Nevertheless, Dion always rated Esboldt a 3 out of 5. [184] ¶ 14. Dion also gave "special projects" to store directors, some of whom were over 60 years old. *Id.* ¶¶ 17–19.[53] The parties dispute whether Dion ever instructed Esboldt to terminate assistant directors. [203] ¶ 7. They also dispute whether Dion said, "if you don't make your numbers, we have plenty of younger Dominick's store managers" at a meeting in 2015. *Id.* ¶ 8.

At some point, Esboldt agreed to be transferred to an "operationally challenged" store. [184] ¶ 25. When Jewel's president Mike Withers visited the store, he liked the store and the perimeter but commented on the low level of stock. *Id.* ¶ 20; [185-16] at 13. Esboldt felt threatened by this. [203] ¶ 6. After Withers's visit,

---

[52] This timeframe is established by Cieslak's briefs. *See* [182] ¶¶ 19–21; [185-13] at 60.

[53] Esboldt's ability to guess the ages of the store directors does not controvert his admission that he did not actually know their ages. [184] ¶ 18. Fact 18 is admitted.

Esboldt's store experienced more visits by operational specialists documenting store conditions. *Id.*[54] The parties dispute whether Dion also asked about Esboldt's age. *Id.*

In May 2016, HR was notified by an operations specialist of a potential inventory problem at Esboldt's store, which prompted an investigation. [184] ¶¶ 28–29. Esboldt was interviewed by Loss Prevention on May 31, 2016, *id.* ¶ 30, during which he admitted to changing the inventory numbers to improve store metrics. *Id.* ¶ 31.[55] At some point, Esboldt wrote and signed a statement, dated "April 31, 2016," in which he stated he changed inventory numbers because he "felt pressure [from his district manager] to make a poor decision" in order to meet store metrics. *Id.* ¶ 32; [146-2] at 50. Jewel alleges this statement was written on May 31, 2016, the same day Esboldt was interviewed. [184] ¶ 32. Esboldt alleges he wrote the statement on April 30, 2016, not May 31, in response to an April inventory request from Dion. [203] ¶ 13.[56] The parties dispute whether Esboldt met with the Loss Prevention specialist in mid-May, during which he denied any wronging with respect to the May inventory. [203] ¶¶ 15, 20. They also dispute whether Esboldt alleged age discrimination during the meeting. [184] ¶ 34.

---

[54] The comments made by the operations specialist Dave Goodwin, [203] ¶ 3; [185-16] at 36, and younger store director, Mike Chimera, [203] ¶ 11, are inadmissible hearsay. *See Makowski*, 662 F.3d at 822–23.

[55] Fact 31 is deemed admitted because there is no citation supporting the alleged factual dispute that no one determined whether Esboldt altered the inventory numbers. That Esboldt was never reprimanded is a separate, additional fact.

[56] This post-deposition sworn testimony is permissible, as it clarifies the date of the statement. *See Kopplin*, 914 F.3d at 1103.

On June 1, 2016, Esboldt signed a document indicating he retired as of May 31, 2016. [184] ¶¶ 2, 35. Esboldt testified he retired because of "unbearable working conditions" and "being accused of something he never did," but he does not dispute that he altered the April inventory report. [203] ¶¶ 13, 16. Esboldt attributed the errors in the May inventory to the mistakes of new employees. *Id.* ¶ 18. Store directors, like Esboldt, were ultimately responsible for maintaining balanced inventory levels and store assets, which included keeping track of inventory levels. [187] ¶ 32. The parties dispute whether Esboldt requested a demotion during these meetings with HR. [184] ¶ 37. Jewel does not permit employees who are under investigation for terminable offenses, like falsifying inventory, to be demoted. *Id.* ¶ 38. Approximately nine months later, Esboldt filed his EEOC charge, which was received on March 20, 2017. [30-6].[57]

### 8. Lester Nelson

Lester Nelson, born in 1960, was a store director at Jewel from 2006 to 2008. [174] ¶¶ 1, 4.[58] In May 2010, he returned to Jewel as a store director at the Downers Grove location. *Id.* ¶¶ 4, 6. Around this time, the vice president of operations, Bill Stark, told Nelson to "work out" his assistant manager Maria Zanis, who had just

---

[57] Esboldt generally alleges that his district managers taught him how to pressure employees into resigning by micromanaging them, challenging them, and not assisting them. [203] ¶ 7. But those teachings are immaterial unless probative of his own treatment, and Esboldt cannot make that connection without conjecture or perhaps a prohibited propensity inference. *See* Fed. R. Evid. 404(b). Esboldt's new allegation that his store did not hire HR manager Rebecca Young's brother around the same time as the inventory issues, [203] ¶ 14, is also disregarded as immaterial to Esboldt's claim of age-based discrimination.

[58] The 56.1 statements about Nelson fail to present a clear chronology.

returned from leave. [212] ¶ 3.[59] Nelson's district manager, Aquanetta Dawson, and HR representative Tim Zielinski instructed Nelson on how to use a PIP to terminate Zanis. *Id.* In 2011, Nelson transferred to the Darien location, which was being remodeled. [174] ¶¶ 10–11. His district manager, DeSantiago, and Zielinski instructed Nelson to place the deli manager on a PIP, and within six months, the manager left Jewel. [212] ¶ 7. Nelson associated PIPs with termination. *Id.* He also experienced multiple health issues, including high blood pressure and a mini stroke, and significant work stress. [212] ¶¶ 11, 25.

In 2014 and 2015, Jewel's president Mike Withers and vice president Jerry Otis visited Nelson's store and did not critique it. *Id.* ¶ 19. In January 2014, Nelson's new district manager Mark Laryea issued Nelson a letter of concern for failure to make payroll. *Id.* ¶¶ 8, 20–21. Nelson disagreed because he thought his labor budget was unfair. *Id.* Laryea transferred two of Nelson's employees to a younger store director's store. *Id.* ¶ 9. One day, after working overnight at Laryea's direction to prepare the store for a corporate visit, Nelson crashed his car and injured his shoulder. *Id.* ¶ 10.

Nelson generally received good performance reviews. [174] ¶ 16. However, in November 2016, Nelson's new district manager Maria Brushenko issued Nelson a

---

[59] While this statement may not be actionable, it is still relevant background evidence. Jewel was also on notice of these statements, which were raised in Nelson's deposition, as indicated by plaintiffs' citation. [185-24] at 4. As an agent of Jewel, vice president Stark's comments are admissible as a party-opponent statement. Fed. R. Evid. 801(d)(2).

letter of concern about the inaccuracy of his labor reporting. *Id.* ¶ 18.[60] A few days later, Brushenko issued Nelson another letter of concern regarding poor job performance and store conditions. *Id.* ¶ 19. In early December, Nelson received his third letter of concern for food safety violations. *Id.* ¶ 20. Nelson personally disagreed with parts of Brushenko's evaluations, believing the issues reflected unrealistic expectations and minor concerns that should have first been addressed with department managers. [212] ¶ 8; [185-24] at 58–61. In January 2017, he was placed on a PIP. [174] ¶ 21. Nelson prepared a written response to the PIP, but instead of submitting it to Jewel, resigned in February 2017 to go work for one of Jewel's competitors. *Id.* ¶¶ 14, 22. Nelson also emailed Jewel's corporate executives to say he had never been so disrespected as under Brushenko's leadership. *Id.* ¶ 27. The email did not mention age discrimination. *Id.* Jewel's HR department attempted to interview Nelson about his allegations, but Nelson refused to talk. *Id.* ¶ 30.[61] Nelson was never transferred to an underperforming store or denied the opportunity to transfer to another store. *Id.* ¶ 24. His EEOC charge was received on March 20, 2017. [30-7].[62]

---

[60] That Nelson subjectively disagreed with the letter of concern does not controvert the letter and its contents.

[61] Plaintiffs' response to this fact fails to cite the record, as required by L.R. 56.1, and is disregarded.

[62] Nelson generally alleges younger store directors received better budgets. [212] ¶ 12. This is speculation and disregarded, as Nelson fails to provide any evidence to infer his personal knowledge for this. His example about Cory Murray, *id.*, has nothing to do with budgets, and without more evidence to permit some type of inference, is immaterial. Any comments made by Murray are also inadmissible hearsay. Nelson alleges younger store directors Lisa Kloc, Nisa Stewart, and Brett Longerquist received larger labor budgets after their store remodels. [174] ¶ 34. His knowledge is based on inadmissible hearsay and is disregarded. *Id.*; [212] ¶¶ 14–15. The comments made by operational specialists Kim Watson and Shelikera

## C. Procedural History

Cesario, Lee, and LaRocco filed their final EEOC charges in December 2015. [30-1]; [30-4]; [30-3]. Cesario indicated the discriminatory conduct, based on retaliation, age, disability, and failure to train, took place from March 2014 to April 2015, and marked the "continuing action" box. [30-1] at 2. He also wrote that in November 2014, he suffered mental and physical injury and took medical leave, and that after returning in January 2015, he was subjected to a hostile work environment and retaliation, based on age and his request to take medical leave, all of which resulted in a mental breakdown in April 2015. *Id.* He did not explicitly allege constructive discharge. Lee alleged he was "constructively discharged." [30-4] at 2. LaRocco claimed he was discharged in retaliation in August 2015. [30-3] at 3.

Cieslak filed a second amended charge in December 2016. [30-2] at 3. He indicated the discriminatory acts, based on retaliation, age, disability, and failure to train, took place from April 2011 to October 2016 and marked the "continuing action" box. *Id.* He did not explicitly allege constructive discharge. He did state that he had complained internally about discrimination three times. *Id.*

Anderson, Esboldt, and Nelson were the last to file their EEOC charges in March 2017. [30-5]; [30-6]; [30-7]. Esboldt alleged he was "discharged" in June 2016.

---

Whitiker are also inadmissible hearsay. *Id.* ¶¶ 16, 23. While Zielinski relied on produced personnel files for information about Lisa Kloc, Nisa Stewart, and Brent Longerquist, fact 36 is immaterial because Jewel offers no information about what the letter of concern and positive reviews related to, to establish some type of comparison. [174] ¶ 36. Jewel's supporting exhibit for fact 36, Exhibit 1A, [146-4] at 5–104, compiles 104 pages of memos with no appendix. The citation is too general to comply with L.R. 56.1.

[30-6] at 1. Anderson and Nelson both alleged they were "constructively discharged." [30-5] at 1; [30-7] at 1.

Each plaintiff's EEOC charge contained the following identical, or nearly identical, allegations: "I was subjected to different terms and conditions of employment than younger employees, including, but not limited to, heightened scrutiny (excessive micromanaging), criticism and reprimand(s) for minor flaw(s) and issue(s) that were never before at issue throughout my career, unwarranted negative performance rating(s) and denial of promotion related to said performance rating(s), increased responsibilities without increased pay and/or increased support staff, failure to train and/or inadequate training, denial of a transfer to another store, and comments from my supervisors related to my age." *See e.g.* [30-1] at 2. They experienced "[u]nwarranted negative performance rating(s) and subsequent placement on a performance improvement plan … transfer to less desirable store locations … disciplinary action … threats, warnings, and intimidation from my supervisors." *See e.g.* [30-2] at 3; [30-3] at 3. And Jewel "continuously and systematically discriminated against and harassed me by engaging in the aforementioned conduct, thus creating a hostile work environment." *Id.*

After receiving their right to sue notices from the EEOC, plaintiffs filed an amended complaint in June 2017, alleging disparate impact and intentional infliction of emotional distress claims for all plaintiffs. [21]. Cesario also alleged disparate treatment under the Age Discrimination in Employment Act and retaliation under the Americans with Disabilities Act. *Id.* Cieslak, Lee, Anderson, LaRocco, Esboldt,

and Nelson all alleged disparate treatment and retaliation under the ADEA. *Id.* Lee also alleged disability discrimination, failure to accommodate, and retaliation under the ADA. *Id.*

Plaintiffs' disparate treatment claims under the ADEA described identical, or nearly identical, adverse actions: transfer to an underperforming and failing store; criticism and reprimands of their performance; building a case for their termination; a campaign of unreasonable and unwarranted discipline; unwarranted and negative performance reviews; denial of bonuses based on negative or positive reviews; unattainable sales goals; write-ups for minor flaws that had previously never been an issue; denial of transfer requests; insufficient training or a failure to train; and denial of labor assistance. *Id.* Likewise, their ADEA retaliation claims relied on identical, or nearly identical, allegations, specifically: unwarranted and negative performance reviews; denial of bonuses; heightened scrutiny and excessive micromanaging; creating a hostile work environment; transfers to smaller volume stores; unhelpful assistance; unattainable sales goals; constructive discharge; or in LaRocco's case, termination. *Id.* Only Lee, Anderson, Esboldt, and Nelson alleged constructive discharge. *Id.* I dismissed plaintiffs' disparate impact claim, IIED claim, and Cesario's retaliation claim under the ADA. [34]; [42].

## III.    Analysis

### A.    Exhaustion of Administrative Remedies

Before filing a federal employment-discrimination lawsuit, plaintiffs must exhaust their administrative remedies by filing charges with the EEOC. *Chaidez v.*

*Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).[63] Their legal claims must be based directly on their EEOC charges, or on claims "like or reasonably related" to the charges—which is when "there is a reasonable relationship between the allegations in the charge and the claims in the complaint" and the claim "can reasonably be expected to grow out of an EEOC investigation" of the initial charges. *Id.* (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). This requirement allows the EEOC to resolve disputes first and gives employers notice of the employee's allegations. *Id.*

EEOC charges are construed liberally because they are often filed by laypersons rather than lawyers. *Chaidez*, 937 F.3d at 1005, n.3 (citing *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009)). However, when represented by counsel, the argument for liberal construction is weakened. *Id.* Regardless, the substance of the charge must support the employee's alleged theory of discrimination. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 n.2 (7th Cir. 2004) (citing *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002)).

Six of the seven plaintiffs allege discrimination based on constructive discharge, [186] at 12, but Jewel argues that Cesario, Cieslak, and Esboldt forfeited this claim by failing to exhaust their administrative remedies. [144] at 22. Constructive discharge occurs when a plaintiff resigns due to discriminatory working conditions even more egregious than that required for a hostile work environment

---

[63] Title VII principles of administrative exhaustion apply equally to ADEA claims. *Reynolds v. Tangherlini*, 737 F.3d 1093, 1101–02 (7th Cir. 2013).

claim, or when an employer acts in a manner that would make clear to a reasonable employee that he will be immediately fired if he does not quit. *Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019) (internal citations and quotation omitted). In either scenario, the work environment must be so intolerably discriminatory that a reasonable person would have been compelled to resign. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010).

The general allegations in each EEOC charge—such as criticism and reprimands for minor flaws, negative performance ratings, denials of transfer requests, and discriminatory comments, *see e.g.* [30-1] at 2—do not describe an environment more egregious than a hostile work environment or suggest that Cesario, Cieslak, or Esboldt faced imminent termination. *See e.g. Jenkins v. Blue Cross Mut. Hosp. Ins. Inc.*, 538 F.2d 164 (7th Cir.1976) (when a discrimination theory is not identified by name, the facts in the EEOC charge must provide sufficient notice to support the legal claim). Cesario specifically noted that Jewel's conduct caused him mental and physical injury, which required him to take medical leave, and after he returned, the discrimination he faced resulted in a mental breakdown on the last date he experienced discrimination. [30-1] at 2. Absent are any facts suggesting Cesario took a second medical leave or quit his job. Similarly, Cieslak alleged no facts to suggest he was forced to quit. [30-2] at 3. Besides using the word "discharged," which suggests termination, Esboldt does not allege any facts to suggest he had no choice but to resign. [30-6] at 1. *See Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 667 (7th Cir. 2001) ("Absent extraordinary conditions, a complaining employee is expected

to remain on the job while seeking redress.") (internal quotation and citation omitted). These plaintiffs' EEOC charges do not directly or indirectly support a constructive discharge claim.

The coordination and timing of the charges supports this conclusion. Cesario filed his amended charge on the same day as LaRocco and Lee, both of whom specifically alleged a discharge theory, while Cesario did not. *Compare* [30-3] at 3, *and* [30-4] at 2, *with* [30-1] at 2. When Cieslak amended his charge after taking medical leave, [182] ¶ 11, he did not update it to include constructive discharge. [30-2] at 3. Esboldt filed his charge on the same day as Anderson and Nelson, both of whom specifically alleged "constructive discharge," unlike Esboldt. *Compare* [30-6] at 1, *with* [30-5] at 1, *and* [30-7] at 1. As the final charges all contained the same cookie-cutter allegations, and appear to have all been filed by plaintiffs' counsel, the argument for a liberal reading is weakened. *Chaidez*, 937 F.3d at 1005, n.3. In contrast to the other plaintiffs, Cesario, Cieslak, and Esboldt strategically abandoned a constructive discharge theory when filing their final EEOC charges.

### B.    Plaintiffs' Employment Discrimination Claims

In Illinois, parties must file an EEOC charge within 300 days of the alleged discriminatory act or unlawful practice. 29 U.S.C. § 626(d)(1)(B).[64] Discrete acts that fall outside the statute of limitations are not actionable but may be used as relevant background evidence in support of a timely claim. *Malin v. Hospira, Inc.*, 762 F.3d

---

[64] A "charge is deemed to be filed with the Commission upon receipt of the document." 29 C.F.R. § 1601.13(a)(4)(ii)(A). *See also Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475–76 (7th Cir. 2009).

552, 561 (7th Cir. 2014) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Incidents constituting a hostile work environment, however, are treated as one unlawful employment practice, and are actionable even if they fall outside of the statute of limitations, so long as the incidents contribute to conduct that falls within the filing period. *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004) (citing *Morgan*, 536 U.S. at 117). Thus, hostile work environment claims reflect the "continuing violation" theory. *Morgan*, 536 U.S. at 103. While failing to check the "continuing action" box on an EEOC charge is not fatal to an employee's claim, *Jenkins*, 538 F.2d at 168, the alleged acts must reinforce each other in order to form a single course of conduct to defeat the statute of limitations. *Lucas*, 367 F.3d at 727. Large gaps in time between incidents, *id.*, and changes in supervisors affect whether incidents are related. *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 852–53 (7th Cir. 2019). "[U]nspecific, speculative allegations cannot connect otherwise distant allegations into a single employment practice." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017).

The ADEA protects workers aged 40 and older from age-based employment discrimination. 29 U.S.C. §§ 621(b), 631(a); *McDaniel*, 940 F.3d at 367. To allege disparate treatment, plaintiffs must establish, by a preponderance of the evidence, that, but for their age, the adverse actions they experienced would not have occurred. *Id.* (citing *Wrolstad v. Cuna Mutual Insurance Society*, 911 F.3d 450, 454 (7th Cir. 2018)) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). In other

words, it is not enough to show that age discrimination was a motivating factor; it must be the only factor causing the adverse action. *Wrolstad,* 911 F.3d at 454.

Plaintiffs can show this by using any combination of direct proof, circumstantial evidence, or the *McDonnell Douglas* framework. *Carson v. Lake Cty., Indiana*, 865 F.3d 526, 532–33 (7th Cir. 2017). Under *McDonnell Douglas*, plaintiffs must prove that they 1) are members of a protected class;[65] 2) were meeting Jewel's legitimate business expectations; 3) suffered an adverse employment action; and 4) similarly situated employees younger than 40 were treated more favorably. *McDaniel*, 940 F.3d at 368. The burden then shifts to Jewel to articulate a legitimate, nondiscriminatory reason for the adverse employment actions, after which the burden shifts back to the plaintiffs to submit evidence that Jewel's explanation is pretextual. *Id.*

In disparate treatment claims, adverse actions materially alter the terms and conditions of employment, and typically fall into one of three categories: 1) a termination or a reduction in financial benefits; 2) transfers or changes in job duties that impair the employee's career prospects; and 3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). Adverse actions are "not merely an inconvenience or a change in job responsibilities." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (collecting cases) (adverse actions

---

[65] All plaintiffs were over 40 years old at the time of the alleged discriminatory conduct and therefore members of the ADEA protected class. *McDaniel*, 940 F.3d at 368.

exclude changes like: increased commute time, unfair discipline, letters of warning, difficult case assignments, additional work, temporary denials, lateral transfers, and reprimands).[66] A hostile work environment is when harassment is so severe or pervasive that it alters an employee's conditions of employment or creates a hostile or abusive atmosphere. *Hamzah v. Woodman's Food Market, Inc.*, 693 Fed.Appx. 455, 458 (7th Cir. 2017) (citing *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677–78 (7th Cir. 2005)).

Constructive discharge is an even higher bar to meet. *See Scurlock v. IRC, LP*, 716 Fed.Appx. 544, 545–47 (7th Cir. 2017); *Fugate v. Dolgencorp, LLC*, 555 Fed.Appx. 600, 602–606 (7th Cir. 2014); *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996); *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993). An employee "may not be unreasonably sensitive to his working environment" and is expected to remain employed while seeking redress "unless confronted with an aggravating situation beyond ordinary discrimination." *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996).

Under any method of proof, the ultimate question is whether the same events would have transpired if plaintiffs had been younger than 40 and everything else had been the same. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 725 (7th Cir. 2018) (internal quotations and citations omitted).

---

[66] The same standard for adverse employment actions apply to ADEA and Title VII discrimination claims. *See Griffin*, 356 F.3d at 829.

To allege retaliation under the ADEA, the evidence, taken as a whole, must permit a reasonable factfinder to conclude that protected activity in opposition to age discrimination caused the adverse action. *McDaniel*, 940 F.3d at 370 (internal quotations and citation omitted). If using the burden-shifting *McDonnell Douglas* framework, plaintiffs must show that they 1) engaged in protected activity; 2) suffered a materially adverse employment action; 3) were meeting Jewel's legitimate expectations; and 4) were treated less favorably than similarly situated employees who did not engage in protected activity. *Id.* at 370–71. The employer's retaliation must be the "but-for" cause of the adverse action, not just a "contributing factor." *Id.* at 371. Unlike disparate treatment claims, however, adverse retaliatory actions are ones that would dissuade a reasonable employee from engaging in the protected activity, and are not limited to just affecting the terms and conditions of employment. *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016); *see also David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 225, n.35 (7th Cir. 2017).

Under these legal rules, all of plaintiff's claims fail. No jury could infer age discrimination or retaliation. The plaintiffs do not effectively dispute the non-discriminatory factors affecting their working conditions, including a company-wide initiative to improve store performance during a time of financial crisis, and the deficiencies in each plaintiff's performance as a store director. The plaintiffs also fail to provide sufficient evidence of a materially adverse action or younger store directors receiving better treatment. Even the inadmissible evidence plaintiffs raise post-

discovery is unhelpful because it is outdated and disconnected from the relevant time period. Ultimately, none of the plaintiffs can show they suffered a materially adverse action at work because of their age or protected activity.

## 1. Timothy Cesario

By failing to exhaust his administrative remedies, Cesario cannot claim he suffered constructive discharge. Even on the merits, Cesario fails to put forward enough evidence to carry his burden at trial. *See Celotex*, 477 U.S. at 323.

Cesario did not suffer an adverse action that materially altered the terms and conditions of his employment during the actionable time period, which started on February 7, 2015. *See* [30-1]. The letters of concern about poor store conditions that Laryea issued in March and April 2015, which also incorporated president Withers's concerns, [180] ¶¶ 19, 24, 30–31, do not rise to the level of an adverse employment action. *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999). Even if Laryea had denied Cesario's transfer request in April, which the parties dispute, [180] ¶¶ 25–26, Cesario admits he was never transferred to underperforming store, *id.* ¶ 29, and denials of lateral transfers are not materially adverse actions. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 275 (7th Cir. 2004). Likewise, Withers's visits and store critiques in January, March and April of that year, [180] ¶¶ 30, 32; [197] ¶ 15, are permissible management techniques. *Ribando*, 200 F.3d at 511.[67]

---

[67] *See also Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) ("If we interpreted these simple personnel actions as materially adverse, we would be sending a message to employers that even the slightest nudge or admonition (however well-intentioned) given to an employee can be the subject of a federal lawsuit; a simple statutory prohibition against retaliation would be turned into a bizarre measure of extra protection for employees who—though they might genuinely need counseling—at one point complained about their employer. We also would be

Cesario relies heavily on background evidence outside the actionable time period to infer age discrimination. However, Laryea's request in 2014 to revamp two departments and his comment that Cesario could not "handle the store," [180] ¶¶ 15, 17, have no bearing on Cesario's age. Even if, after inspecting the revamp, Laryea asked Cesario about his age and retirement plans one time in November 2014, one isolated incident does not permit an inference of age discrimination if the employee is performing inadequately or there is an alternative explanation for the employer's behavior. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605–06 (7th Cir. 2012) (citing *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997)). Here, Laryea said Cesario could not handle his responsibilities during a time when Laryea was increasing pressure on all his store directors to improve numbers, as Jewel was facing significant financial pressure. [180] ¶¶ 12, 22–23; [191] ¶ 1. And Laryea continued to push his store directors in 2015, contacting them about payroll issues and expressing concern about the decline in store conditions. [180] ¶¶ 21–22. Cesario's personal disagreement with Laryea's assessments does not permit an inference of age discrimination. *Mollet v. City of Greenfield*, 926 F.3d 894, 898 (7th Cir. 2019) (citing *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)) (standing alone, "a plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact" as to an

---

deterring employers from documenting performance difficulties, for fear that they could be sued for doing so. Employees would be left in the dark as to how they could improve their work performance, and employers would be less able to establish the fact that poor performance, rather than some unlawful motivation, prompted a decision to fire, demote, etc.")

employer's motivations). Finally, Cesario's "working out" theory from the 1990s and 2000s, *see e.g.* [197] ¶ 2, is disregarded as speculation since he cannot connect these allegations to Laryea's and Withers's conduct decades later.

In his response brief, [179], Cesario does not even attempt to argue that these actions amount to a hostile work environment, and so even if he had exhausted his administrative remedies, he cannot establish conditions more "egregious" under a constructive discharge theory. *See Fields*, 928 F.3d at 625. Unpaid medical leave may amount to constructive discharge if it is forced and the employee is barred from returning to work. *See White v. Honeywell, Inc.*, 141 F.3d 1270, 1279 (8th Cir. 1998); *Ceska v. City of Chicago*, 2015 WL 468767, at *5 (N.D.Ill. 2015) (collecting cases); *Knight v. Computer Sciences Raytheon (CSR)*, 2002 WL 32818520, at *14 (M.D.Fla. 2002) ("being placed on unpaid suspension and unpaid medical leave can be considered adverse employment actions."). Here, however, Cesario presents no evidence that Jewel forced him to take unpaid medical leave; rather, Cesario elected to take it. [180] ¶ 34.[68] And he does not allege Jewel prohibited him from returning to work. *See* [180] ¶ 28. Nor does Cesario present sufficient evidence that Jewel acted in a manner that indicated he would be fired immediately because of his age, if he did not resign. *See Fields*, 928 F.3d at 625. Laryea never rated Cesario below a 3 out of 5 or placed him on an improvement plan. [180] ¶¶ 6, 8, 27.

---

[68] Cesario's subjective belief that Laryea's and Withers's oversight caused his medical conditions does not prove he was forced by Jewel to take unpaid medical leave. Additionally, Cesario's leave was not unpaid, initially. *See* [179] at 3 (After six-months of short-term disability, Cesario was only earning 60 percent of his salary.). Plaintiffs cite to additional fact 18 to support this allegation, but fact 18 contains no information about Cesario's earnings. *See* [197] ¶ 18.

Cesario cites directly to the record to argue he was held to a different standard than younger store directors based on performance reviews from 2014. *See e.g.* [179] at 6–7. These facts, which fall outside the actionable time period, are disregarded. Furthermore, while similarly situated employees need not be identical, they must be directly comparable to the plaintiff in all material respects. *McDaniel*, 940 F.3d at 368–69. Typically, a plaintiff must show that the comparators 1) dealt with the same supervisor; 2) were subject to the same standards, and 3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Id.* (internal citations and quotations omitted). Cesario fails to suggest he was directly comparable to Nisa Stewart.[69] Indeed, the evidence suggests they were not because Stewart had a "show and tell" store. *See* [197] ¶ 8, [185-10] at 57–58. Cesario also presents no evidence of younger store directors with the same store conditions facing different, more attainable goals. [179] at 6–7. Thus, he cannot create a genuine dispute through the *McDonnell Douglas* inference.

Cesario also claims that his labor budget was used to help younger store directors at his expense, and that he was initially replaced by a younger store director. [197] ¶¶ 16–17. To prove his first point, he relies on isolated and disconnected examples outside the statute of limitations.[70] And ultimately, these

---

[69] Stewart received additional labor on two occasions: one when her store was selected as a "show and tell store" and the other when she needed help over a holiday. [197] ¶ 8; [185-10] at 57–58. Cesario sent two salaried employees from his store to help. [185-10] at 58.

[70] In a post-deposition affidavit, Cesario claims Laryea instructed him to use his labor budget to help younger store directors Jim Anderson, Jim Keleher, Mino Clemente, Sandra Snyder, Nisa Stewart, and Jose Valentine, which hurt Cesario's store conditions. [197] ¶ 17. I

comparisons are inapposite because he presents no evidence that he made similar labor requests but was denied the same support. *See Abrego v. Wilkie*, 907 F.3d 1004, 1014, n.3 (7th Cir. 2018). He relies on inadmissible evidence to prove his second point. *See supra* note 19. Thus, under any method of proof—direct, circumstantial, or prima facie—Cesario fails to show he suffered a material employment action because of his age.

Plaintiffs conceded that Cesario failed to state a claim for retaliation under the ADA and requested leave to amend the complaint, which I granted. [34] at 17–18. Any amended complaint was due by February 6, 2018. [42]. Generally, amendments should be freely given, Fed. R. Civ. P. 15(a)(2), and new legal theories may be raised for the first time on summary judgment. *See BRC Rubber & Plastics, Incorporated v. Continental Carbon Company*, 900 F.3d 529, 540 (7th Cir. 2018). But when a scheduling order is in place, "good cause" is required to modify it. Fed. R. Civ. P. 16(b)(4). "Good cause" primarily considers the diligence of the party requesting a

---

presume by "Jose Valentine," plaintiffs mean Jose DeJesus and Dennis Valentine. First, the underlying facts—which required scouring the record—do not show how Cesario's store was "adversely affected," or how Cesario's labor budget was used to help the stores of Jim Anderson, Mino Clemente, or Sandra Snyder. These parts of the statement are stricken. Cesario personally recalled sending help to DeJesus, during the 2011 to 2013 time period and using salaried management from his store to help the store of another younger store director, Valentine, in 2013 or 2014. [185-10] at 31. Cesario testified that in 2012 or 2013, Keleher experienced a power outage at his store, so Cesario and other store managers had to help for the day. [185-10] at 58. During these instances, Laryea may not have been Cesario's district manager. [185-10] at 31, 58. Cesario also states he did not receive any additional help when his store experienced an outage in approximately 2009 or 2010, [185-10] at 58, and that he was given "little to no help" during his store remodel in 2012. [185-10] at 31. Laryea was not his district manager on these occasions. [185-10] at 31, 58. These examples span approximately six years and different district managers.

modification to the schedule. *Alioto v. Town of Lisbon*, 651 F.3d 715, 719–20 (7th Cir. 2011). Here, plaintiffs missed the scheduling order deadline and never sought an extension. Then, over a year and a half later, when filing a response to summary judgment, plaintiffs argue Jewel waived dismissal of a count that had already been dismissed. [179] at 8; [34]. Plaintiffs cannot swap diligence with deception. Cesario, not Jewel, waived his ADA retaliation claim. Furthermore, as discussed above, Withers's visit to Cesario's store and critique of store conditions, on the day Cesario returned to work from his first medical leave, [180] ¶ 30, does not amount to a retaliatory adverse action. *See Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118–19 (7th Cir. 2001) ("[T]wo warnings do not amount to a materially adverse employment action and thus do not constitute illegal retaliation" under the ADA.).

### 2. Steve Cieslak

Like Cesario, Cieslak failed to exhaust his administrative remedies and cannot claim constructive discharge. His claim fails on the merits too.[71] The only adverse action Cieslak alleges is a forced medical leave. [181] at 7. A forced unpaid medical leave may amount to constructive discharge under the ADEA if it amounted to intolerable pressure to quit and was because of age. But there is simply no evidence that when Cieslak took leave—and for the two months prior—he faced the requisite intolerable working conditions because of his age. In August 2016, Maria Brushenko became Cieslak's manager. [182] ¶ 15. Cieslak does not allege Brushenko

---

[71] Cieslak's response brief, [181], contains a number of facts that cite the record directly, bypassing the L.R. 56.1 statements. These facts, which do not affect the outcome of the case, are disregarded. *See Mervyn,* 142 F.Supp.3d at 664.

discriminated against him.[72] In October 2016, Cieslak went on medical leave and is still employed to this day. *Id.* ¶ 11.[73]

Cieslak relies on Laryea's conduct during the actionable time period, from August 30, 2014 onwards, [30-2] at 1, to impute age-based discrimination to his time under Brushenko in 2016. After Laryea emailed all his store directors in September 2014, saying he lost patience and trust because store directors were not executing basic tasks and achieving targets, [182] ¶ 28, Laryea placed Cieslak on a PIP in November 2014, and Cieslak felt pressured to resign. [200] ¶ 16. Cieslak was placed on another PIP in January and May 2015. [182] ¶ 13. Not only are PIPs, on their own, not adverse actions, *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016), but by December 2015, ten months before his medical leave, Cieslak had successfully completed and been removed from his PIPs. [182] ¶ 14. Laryea's delay of Cieslak's lateral transfer, which cut his commute by half but did not meet his preference for a profitable store, *id.* ¶¶ 7–8, likewise does not constitute an adverse action. *Dandy*, 388 F.3d at 275.

---

[72] Three facts about Brushenko are disregarded. Cieslak's response brief describes an inadmissible alleged email interaction from September 2016 between Cieslak and Brushenko about insufficient labor. [181] at 9. This fact is not in the L.R. 56.1 statements and the underlying citation, "Exhibit 18, Cieslak Dep. Ex. 34," is actually a 2014 email chain with Laryea. [185-14] at 6–8. Cieslak also alleges Brushenko lowered his labor budget, but this new allegation is raised in Cieslak's response, [182] ¶ 11, instead of as a separate additional statement, in violation of L.R. 56.1(b)(3). Finally, Cieslak's statement of additional facts, [200], does not mention Brushenko at all. Additional fact 5 cites to multiple pages of Cieslak's deposition testimony, in which Cieslak testified he experienced "the same crap" with Brushenko. [185-13] at 80–81. Even if all these facts were admissible, there is no evidence of Brushenko's age-animus or that she treated younger store directors more favorably. Cieslak would still fail to carry his burden of proof.

[73] Moreover, Cieslak's medical leave was paid. For the first six months, Cieslak was paid 100 percent of his salary, and 60 percent for the remaining. [181] at 7.

Cieslak worked grueling hours, [200] ¶ 3, and faced more frequent visits by operational specialists and Laryea. *Id.* ¶¶ 8–9, 11.[74] In January, June, and August 2015, coinciding with some of his PIPs, Cieslak reported age discrimination to HR. [182] ¶¶ 17, 22. He filed and amended his EEOC charge in 2015 and amended it again in December 2016. [30-2]. However, Cieslak does not provide any specifics about his complaints besides the fact that he made them. Nor does he present enough evidence to dispute Jewel's explanation of Laryea's efforts, as part of a district-wide push to improve store performance. [182] ¶ 28; *see also Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (plaintiffs must address all of an employer's suggested reasons for the challenged action). Cieslak's subjective disagreement, on its own, is insufficient to contradict Jewel's explanation of the conduct. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) ("An employee's self-serving statements about his ability are insufficient to contradict an employer's negative assessment of that ability.") (internal citation and quotation omitted). Thus, there is insufficient evidence that Jewel was motivated by a discriminatory reason or gave a dishonest explanation. *See Mullin*, 732 F.3d at 778. Furthermore, Cieslak admits that Laryea's behavior towards him changed only after Cieslak challenged Laryea at a payroll

---

[74] Plaintiffs cite directly to the record, "Cieslak Dep. Ex. 3," to establish that Cieslak saw a schedule that indicated his store was being visited more than other stores, [181] at 3, but there is no "Ex. 3" in the record, so this fact is disregarded. Cieslak also cites to inadmissible hearsay to suggest Laryea approached other employees in 2016 to obtain information to terminate Cieslak. [200] ¶¶ 2, 12. Plaintiffs again cite directly to the record without laying foundation for a statement by one of Cieslak's coworkers about Laryea's outreach. [181] at 8; [185-14] at 15. These facts are disregarded. *See Kreg Therapeutics, Inc.,* 919 F.3d at 415 (the district court is not required to scour the record). Moreover, even if admissible, anti-age animus cannot be inferred from this evidence.

meeting, [200] ¶ 10; [185-13] at 93, which was a personality conflict that had nothing to do with Cieslak's age.

Cieslak also relies on background evidence, outside the statute of limitations, to infer anti-age animus. The only comments about age were made once in 2013 by district managers Negron and DeSantiago, when New Albertsons purchased Jewel. [182] ¶¶ 20–21; [185-13] at 60; [191] ¶ 1. DeSantiago also said HR pressured him to place Cieslak in a "watch box," although Cieslak was still rated satisfactorily. [200] ¶ 1; [185-13] at 30. Without more evidence, it is not reasonable to impute these dated comments to Laryea and Brushenko. In 2014, Cieslak complained to Laryea about age discrimination. [182] ¶ 17. Under Laryea, Cieslak experienced more store inspections. [200] ¶ 4. However, without more factual support, these conclusory statements do not permit an inference of Laryea's, or the company's, anti-age animus. Nor do they undermine Jewel's explanation that Cieslak was not performing well, and that Jewel needed all stores to improve performance for the company to survive. [182] ¶ 28; [191] ¶ 1. Finally, Cieslak's evidence about a "working out" policy from the 1990s, 2007, and one incident at his second to last store, to infer a company-wide "directive" targeting older employees decades later, in 2016, is inadmissible and disjointed. [200] ¶¶ 13–15.[75]

Cieslak does not even attempt to argue these actions constitute a hostile work environment claim. *See* [181].

---

[75] Jewel's emphasis on the lack of written evidence of a "directive" is not persuasive, however, because plaintiffs are not limited to using written evidence.

Cieslak also fails to show younger store directors received better treatment. While Cieslak had knowledge of store conditions of some store directors, [185-13] at 73, 76; 84–87; 89–91, he fails to show Hollie Abernathy, Mino Clemente, Jose DeJesus, Kevin Derrico, Lisa Kloc, Keith Murray, Nisa Stewart, and Dennis Valentine were directly comparable.[76] *See McDaniel*, 940 F.3d at 368–69. Individual stores faced unique challenges, like nearby competition, and could be subject to different sales, labor, inventory, costs, and other goals. [187] ¶¶ 9–11. A centralized department customized labor budgets, accounting for each store's unique configurations. [185-3] at 9; [187] ¶ 12; [191] ¶ 2. Cieslak does not establish whether his store was even comparable to the stores of younger store directors based on these various factors. While comparisons need not be identical, differentiating or mitigating circumstances should be explained. *McDaniel*, 940 F.3d at 368–69. Furthermore, some of Cieslak's evidence is based on inadmissible hearsay. *See supra* note 25.

The parties also cite directly to deposition exhibits about comparators. While this evidence is disregarded, nevertheless, Laryea's note to file to Abernathy, and letter of concern to Valentine about CSI results are substantively incomparable to Cieslak's conduct, meaning they are not similarly situated to him. [185-14] at 42–43. Cieslak and Keleher were both placed on PIPs, removed, and then transferred stores, so Cieslak cannot show Keleher was treated more favorably. [185-14] at 16–23; [185-

---

[76] Jewel points out that plaintiffs lack personal knowledge about comparators, but plaintiffs are not limited to evidence based on their personal knowledge.

13] at 72. Finally, while Cieslak dives into Derrico's performance reviews[77] and the ratings issued to Abernathy, Derrico, and DeJesus, [181] at 6–7, as noted above, he still fails to provide sufficient evidence to establish these three directors were even comparable.

With respect to his ADEA retaliation claim, Cieslak's internal and external complaints about age discrimination constitute protected activity.[78] *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (for complaints "to constitute protected activity, they must include an objection to discrimination on the basis of age.") (internal citation omitted). The last complaint Cieslak made before taking medical leave in October 2016 was in December 2015. [182] ¶¶ 11, 22. Even if Cieslak suffered an adverse action, the ten months between his complaint and medical leave is too long to infer causation. *See Seymour-Reed v. Forest Preserve District of DuPage County*, 752 Fed.Appx. 331, 336 (7th Cir. 2018) (four-month period between the complaint and discharge was insufficient to establish a causal connection between the protected activity and adverse employment action) (citing *Silk v. Board of Trustees, Moraine Valley Community College, Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015) and *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012)). Cieslak's retaliation claim fails.

### 3. James Lee

---

[77] While it may have been Jewel's policy to PIP any store director rated a 2 or below, that does not exclude the possibility that an employee with a 3 rating could still be PIPed.

[78] Some of Cieslak's complaints fall outside the statute of limitations.

Lee did not experience constructive discharge during the actionable time period, which began on October 3, 2014. [30-4] at 1.[79] The comment by an operational specialist that touched on retirement, one store visit and critique by president Withers, and the increased visits by operational specialists and Ruiz, [176] ¶¶ 27, 33; [209] ¶ 19; [185-21] at 87–88, are not adverse actions based on age. While Withers's visit triggered Lee's stress and anxiety, *id.*; [209] ¶¶ 19, 21, "unfair reprimands or negative performance evaluations unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) (internal citation and quotation omitted). Lee was never penalized after Withers's visit. Furthermore, Lee had "no complaints" about his district manager Ruiz, whom he reported to from January 2015 until he resigned in March 2015. [176] ¶ 39; [209] ¶ 20. These are not intolerably discriminatory working conditions.

Lee relies heavily on evidence outside the actionable time period to establish a continuing violation.[80] Over three years, Lee worked at three different stores, under three different district managers. The gaps in time and changes in supervisors sever these unrelated incidents. *See Ford*, 942 F.3d at 852–53. And there is no evidence

[79] Lee's response brief, [175], contains direct citations to the record and many uncited facts. These are disregarded. *See* N.D. Ill. Local R. 56.1; *Mervyn*, 142 F.Supp.3d at 664.

[80] Lee raised a hostile work environment theory in his EEOC charge, so he properly exhausted his administrative remedies. [30-4] at 2. Lee also alleged a hostile work environment in the amended complaint, albeit in the context of an ADEA retaliation claim and his ADA claims. [21] at 53–57. Finally, contrary to Jewel's argument, Lee is not raising "new facts" by alleging a hostile work environment claim on summary judgment. Even if this were a new legal theory, it would not unduly prejudice Jewel. *See BRC Rubber & Plastics, Inc.*, 900 F.3d at 541.

that district manager Harris's letter of concern in 2012, for failing a store audit, was pretext for age discrimination. [176] ¶ 15. Lee's subjective disagreement with DeSantiago's rating-downgrade for the 2013–2014 period, without more, is insufficient to create an issue of material fact. *See Mollet*, 926 F.3d at 898. The same analyses apply to Lee's time under Laryea, who issued Lee a PIP and letters of concern, including for municipal code violations for expired food product. [176] ¶¶ 16–18; *see Ribando*, 200 F.3d at 511. And Lee's lateral transfers offered the same or better benefits, [176] ¶¶ 7, 12, and therefore do not constitute adverse actions. *See Dandy*, 388 F.3d at 275. Ultimately, none of these acts "reinforce" one another to form a single course of conduct that persisted during Lee's time under Ruiz. *See Lucas*, 367 F.3d at 727.

The only age-related evidence Lee presents is non-actionable background evidence that cannot be imputed to Ruiz. Laryea pressured Lee about retirement over two conversations in July 2014, and district managers DeSantiago and Negron asked Lee why he did not take the store director buyout in 2011. [178] ¶¶ 28, 31, 35. To the extent these can be considered "suggestions of retirement," they do not show age discrimination because there are alternative explanations for the negative performance reviews his district managers issued—namely Lee's noncompliant store conditions. *See Fleishman*, 698 F.3d at 606. And while Lee subjectively felt his conditions were adequate given the operational challenges and level of staff,[81] [175]

---

[81] Additional statement of fact 11, [209] ¶ 11, contains no information about the store's increased earnings in the summer of 2014; this fact in Lee's response brief, [207] at 6, is

at 7, he was ultimately responsible for ensuring the store complied with Jewel's policies and standards—not his own. [187] ¶¶ 18, 21, 28, 37. Lee also admits he resigned for non-age-related reasons, including the hours, stress, and needs of his family. [176] ¶ 37; [146-3] at 269; [209] ¶ 21. This evidence does not meet the exacting but-for standard under the ADEA. *See Gross*, 557 U.S. at 175 (age cannot be one motivating factor; it must be the only reason for the adverse action).[82]

Lee relies on hearsay and speculates about younger store directors working at "more advantageous stores." [209] ¶ 9; *see supra* note 35. Lee generally incorporates other plaintiffs' evidence about store directors without providing any evidence about differentiating or mitigating circumstances based on the variety of factors, *see* [187] ¶¶ 9–12; [185-3] at 9; [191] ¶ 2, that distinguished stores. *See McDaniel*, 940 F.3d at 368–69. And there is no evidence about how Ruiz treated younger store directors.[83]

Assuming Lee's email to HR and two medical leaves are protected activities, [176] ¶ 26, Lee's ADEA and ADA retaliation claims still fail because Lee cannot prove but-for causation or an adverse action. "Both the ADA and the ADEA prohibit employers from retaliating against employees who exercise their rights under those

---

therefore disregarded. Furthermore, Lee's subjective disagreement is insufficient to create a material dispute. *See Mollet*, 926 F.3d at 898.

[82] Like the other plaintiffs, Lee's theory about Jewel's "working out" policy from the mid-2000s, [209] ¶ 1, is disregarded as speculation. Furthermore, Lee's claim that DeSantiago and Negron made comments about tenure and seniority are stricken under the sham affidavit rule. [209] ¶ 2; [185-21] at 87. *See supra* note 35.

[83] Not only are Lee complaints to DeSantiago and Laryea about an insufficient labor budget immaterial to his claim, *see supra* note 35; [209] ¶ 18, but these time-barred comments are also not relevant to Ruiz, since Lee admitted he had "no complaints" about Ruiz. [175] at 3–4; [176] ¶ 39.

statutes," *Silk*, 795 F.3d at 710, and require proof of the same elements. *See McDaniel*, 940 F.3d at 370–71 (ADEA retaliation claim) (citing *Boss*, 816 F.3d at 918) (ADA retaliation claim). Lee's first medical leave and missed bonus in the summer of 2014, [178] ¶¶ 10–11, are time-barred. Moreover, Lee's bonus was withheld because of Lee's below average rating, [209] ¶ 11, not because of protected activity. Withers's visit was over a month after Lee returned from his second medical leave and emailed HR. [176] ¶¶ 26, 33. This lapse in time is insufficient to infer but-for causation. *See Abrego*, 907 F.3d at 1015. And, as discussed in the disparate treatment analysis above and below in footnote 84, professional criticism and denial of a discretionary bonus do not amount to adverse actions.

Lee also alleges disparate treatment under the ADA, which requires proof that 1) he was disabled; 2) he was qualified to perform essential functions with or without reasonable accommodation; and 3) his disability was the "but for" cause of the adverse employment action. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). However, this claim also fails because the relevant conduct—his first medical leave and Jewel's subsequent withholding of his bonus—took place before October 2014 and is time-barred.[84]

Lee's failure to accommodate claim, which requires proof that 1) he was a qualified individual with a disability; 2) Jewel was aware of his disability; and 3)

---

[84] Even if it were actionable, Lee's claim would still fail because loss of a discretionary bonus is not an adverse employment action. *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (internal citations omitted). Lee testified he did not get his bonus because of his "2" rating. [209] ¶ 11. There are no facts in the record about Jewel's bonus policies.

Jewel failed to accommodate his disability reasonably, *Scheidler*, 914 F.3d at 541, also fails because Laryea's conduct, which predates October 2014, [176] ¶ 23, is time-barred and non-actionable. In any event, Jewel approved Lee's 40-hour week accommodation, and Laryea's three violations, which required Lee to work an additional 15 to 45 minutes, *id.* ¶¶ 19–23, are insufficient to show the interactive accommodation process broke down. *Scheidler*, 914 F.3d at 542 (reasonable accommodations are a process, and one breach does not necessarily signify a breakdown in the interactive process.).[85]

###    4.    Frank Anderson

Anderson cannot prove constructive discharge under the ADEA.[86] The denial of Anderson's lateral transfer request, [172] ¶¶ 18–19, around the time the actionable period began—May 24, 2016, [30-5]—is not an adverse action. *See Dandy*, 388 F.3d at 275.[87] Moreover, Anderson does not present enough evidence to challenge the legitimacy of Jewel's explanation: that the VP of operations did not like moving store directors. [172] ¶ 19; *see Mullin*, 732 F.3d at 778. Any comments district manager Boyle made about retirement are explained by Anderson's real estate investments, not his age. [176] ¶¶ 19–20; [185-6] at 38; *see Fleishman*, 698 F.3d at 606. There is no dispute that Boyle's threat of termination was triggered by his labor disagreement with Anderson. [194] ¶ 7; [185-6] at 34. A factfinder could not reasonably infer these

---

[85] Lee does not allege Ruiz failed to accommodate Lee's requests after his second medical leave, [176] ¶ 25, which would be actionable under the statute of limitations.

[86] Anderson withdrew his ADEA retaliation claim. [171] at 8.

[87] Anderson's transfer request in the second quarter of 2015, [185-6] at 37, 56, is time-barred and likewise not an adverse action.

experiences would have been different had Anderson been younger than 40. *See Skiba*, 884 F.3d at 725.

Anderson was hostile to Laryea when they first met in September 2016, and Laryea asked about retirement. [172] ¶¶ 27–28; [185-6] at 40–41. But, unlike other plaintiffs, Anderson never received a negative performance review or a below satisfactory rating from Laryea. [172] ¶ 31. Three months later, Laryea asked about Anderson's retirement date multiple times based on store chatter about Anderson's retirement. *Id.* ¶¶ 32–33; [185-6] at 45. This is not evidence of "hounding." Furthermore, Anderson presents insufficient evidence that Laryea's explanation for his inquiry was dishonest. *See Fleishman*, 698 F.3d at 606. While Anderson's store experienced more inspections by operational specialists, visits by Larea, and frequent photo documentation, [172] ¶¶ 35–36; [194] ¶¶ 9–11, these are not discriminatory adverse actions but rather permissible management tools.[88] *Ribando*, 200 F.3d at 511.

Anderson does not even attempt to argue that these problems amounted to a hostile work environment. *See* [171]. Nor can he succeed on a constructive discharge claim, which requires an environment even more egregious. *Fields*, 928 F.3d at 625. Here, Anderson experienced negative personality conflicts with two different district managers, with no material consequences to the terms and conditions of his employment. While Anderson may have personally felt "forced out," paranoid about

---

[88] Anderson admits that when he was a district manager, he made daily visits to stores, like Laryea did. [172] ¶ 5.

being fired, and emotionally and physically distressed, [172] ¶¶ 35–36; [194] ¶ 18; [185-6] at 46–47, there is insufficient evidence that a reasonable employee would have been compelled to resign under these conditions. *See Chapin*, 621 F.3d at 679 ("[A] working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'") (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir.2004)).

Because Anderson impermissibly speculates about younger store directors, [194] ¶¶ 2–3; *see supra* note 40, he fails to provides sufficient evidence about any similarly situated younger store director actually receiving higher labor budgets or being transferred to more profitable stores.[89] The information about George Lane and Spiro Piperi was never raised in the 56.1 statements and is therefore disregarded. Furthermore, Piperi's observations about labor budgets would be inadmissible hearsay. Under any discrimination theory, Anderson fails to carry his burden of proof.[90]

### 5. *Gregory LaRocco*

LaRocco experienced an adverse action when he was terminated in August 2015. *See Barton*, 662 F.3d at 453–54. However, he fails to present enough evidence to sustain a claim under either the *McDonnell Douglas* or cumulative standard for

---

[89] To the extent Anderson's labor requests were denied after his fallout with Boyle, [194] ¶¶ 9–11, Anderson testified that Boyle's behavior was not due to Anderson's age. [194] ¶ 7; [185-6] at 34. Jewel also notes, [192] at 8–9, that in 2015, Anderson actually achieved labor savings and had a budget surplus. *See also* [185-6] at 32–34.

[90] Even if Anderson's inadmissible evidence, which is based on Anderson's time as a district manager in and before 2011, were admissible, it is either temporally irrelevant or devoid of age-animus, or both, and cannot be imputed to the actionable time period. *See supra* note 40.

disparate treatment. LaRocco personally considered his transfer in 2010 or 2011 a demotion and disagreed with his June 2014 PIP, [178] ¶¶ 1–2, 4; [206] ¶¶ 4–5, but this conduct falls outside the actionable period and there is no evidence of age-animus or material changes to LaRocco's terms and conditions of employment. *See Dandy*, 388 F.3d at 275; *Mollet*, 926 F.3d at 898.

Likewise, LaRocco's subjective disagreement with his performance reviews, [206] ¶ 16, during the actionable period, which began on October 10, 2014, [30-3] at 1, is insufficient to prove LaRocco was meeting his employer's legitimate expectations. *See Sublett*, 463 F.3d at 740. He was not. While LaRocco's performance had improved by the end of 2014, [178] ¶ 8, by February 2015, he admitted he was struggling, and Romanello suggested other positions at the company. *Id.* ¶¶ 10–11. By May 2015, Romanello downgraded LaRocco to a 1 and placed him on a PIP. *Id.* ¶¶ 13–14. LaRocco was given additional support, *id.* ¶ 17, although he claims he never received better department managers. [206] ¶ 4. In June 2015, LaRocco did not provide a timely update on a coleslaw recall, [178] ¶ 18, and failed to key in milk inventory. *Id.* ¶ 19. That LaRocco achieved satisfactory ratings under a different district manager in previous years, [206] ¶ 20, does not cast doubt on the fact that he was not meeting Jewel's expectations in August 2015. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) (the legitimate expectations analysis concerns a plaintiff's conduct the time of the adverse action, not the past).

LaRocco's evidence of ageism is also lacking. The parties dispute whether Romanello made comments about termination in May 2015 and retirement in June

2014. [178] ¶¶ 12, 34; [206] ¶¶ 7, 9; [185-18] at 22. Even assuming these occurred, LaRocco admits Romanello did not discriminate against him based on age. [178] ¶ 25; [185-18] at 54. And LaRocco's post-discovery theory about a company-wide directive targeting older employees is inadmissible. *See supra* note 50.

LaRocco's evidence that Romanello treated similarly situated younger store directors more favorably is similarly speculative, hearsay, and inadmissible. *See supra* notes 41, 48, 50. The information LaRocco learned from his former deli manager, [177] at 5, is also disregarded because it is not in the 56.1 statements and is based on inadmissible hearsay. There is simply no evidence that a younger store director who similarly failed to meet expectations (like with recall failures) was not terminated. *See Abrego,* 907 F.3d at 1014, n.3.

Under a retaliation theory, LaRocco's internal complaints do not amount to protected activity because they were not about age-discrimination. [185-18] at 56; [178] ¶ 34; [206] ¶¶ 9,11; *see Smith*, 674 F.3d at 658. While LaRocco's EEOC charge is protected activity, [178] ¶ 35; [30-3], LaRocco's ADEA retaliation claim still fails. A decision-maker must know of the protected activity for an employee to claim retaliation. *Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018). It is undisputed that Romanello decided to terminate LaRocco, [178] ¶¶ 20–23, and was unaware of the EEOC charge. *Id.* ¶ 36. While the parties dispute HR's role in LaRocco's termination process, [206] ¶¶ 18–19, there is no evidence that Kevin Bell also participated in the decision to terminate LaRocco. *Id.* ¶ 19. And while the EEOC charge and termination were in close proximity of one another, the supporting facts sever temporal causation.

*See Abrego*, 907 F.3d at 1015. Finally, LaRocco cannot establish retaliation "but for" his EEOC complaint because there is ample evidence of non-discriminatory factors, specifically his inadequate performance over many months. *See McDaniel*, 940 F.3d at 371.

### 6. Edward Esboldt

By failing to exhaust his administrative remedies, Esboldt cannot claim constructive discharge. Nor can he succeed on the merits.[91] During the actionable time period, which started on May 24, 2016, [30-6], Esboldt admitted to falsifying inventory numbers due to pressure to improve store metrics. [184] ¶¶ 31–32. The parties dispute whether his confession pertains to April or May inventory numbers, but that does not matter. Esboldt does not dispute that he altered the April inventory report. [203] ¶ 13. Although he claims he was falsely accused of manipulating May's inventory numbers, [183] at 6, he simultaneously suggests any mistakes from that time were due to "new managers who did not have a lot of experience in accounting for inventory." [203] ¶ 18. It is undisputed that Esboldt was always required to maintain balanced inventory levels and store assets, including keeping track of inventory levels, [187] ¶ 32, and that he did not. As store director, Esboldt was also responsible for his employees' compliance with company standards. *Id.* ¶¶ 21, 23. Esboldt cannot show he retired solely because of age discrimination, before being fired for fraud. *See McDaniel*, 940 F.3d at 367. Even if Esboldt requested a demotion at the time, [184] ¶ 37, Jewel does not permit employees under investigation for terminable

---

[91] The uncited facts in Esboldt's response brief, [183], are disregarded.

offenses to be demoted. *Id.* ¶ 38. Esboldt fails to present enough evidence for a factfinder to reasonably infer that he left the company because of intolerably ageist working conditions.

Esboldt attempts to bolster his claim by alleging a continuing violation. Esboldt is correct that failure to check the "continuing action" box is not fatal to his claim, *see Jenkins*, 538 F.2d at 168, and he did exhaust his administrative remedies by alleging a hostile work environment in his EEOC charge. [30-6]. However, while Esboldt felt threatened by president Withers's visit in January 2016 and the increased visits by operational specialists, [184] ¶ 20, [203] ¶ 6, Withers's visit did not "reinforce" Esboldt's decision to alter inventory numbers during the actionable time period to form a single course of conduct. *See Lucas*, 367 F.3d at 727.[92] Even if Dion asked about Esboldt's age after Withers's visit, [203] ¶ 6, there is no evidence connecting this isolated comment to the actionable time period. *See Milligan-Grimstad*, 877 F.3d at 713.

The other background evidence is also insufficient. Esboldt's agreement to transfer to an operationally challenged store, [184] ¶ 25, and subjective disagreement with Dion's criticisms, *id.* ¶ 8, are not evidence of a culture of intolerable working conditions. *See Dandy*, 388 F.3d at 275; *Mollet*, 926 F.3d at 898. Even assuming Dion directed Esboldt to "work out" assistant directors, [203] ¶ 7, there is no evidence of their ages. Finally, the alleged age-based comment made by Dion about younger

---

[92] The comments made by other employees after Withers's visit are inadmissible hearsay. *See supra* note 54.

Dominick's store managers at a district-wide meeting in 2015, *id.* ¶ 8, and DeSantiago's and Negron's longevity comments in 2013, [203] ¶ 3, are too temporally distant and unrelated to infer Esboldt retired in 2016 solely because of age discrimination. *See Lucas*, 367 F.3d at 727; *Ford*, 942 F.3d at 852–53.[93]

While Esboldt's rating may have been satisfactory, [184] ¶ 14, he was not meeting expectations at the time he left the company because he was under investigation for fraud. *Id.* ¶ 29; *see Naik*, 627 F.3d at 600.[94] And Esboldt does not allege Jewel's investigation was illegitimate. Finally, while Esboldt alleges Dion treated younger store directors better, he fails to establish they were directly comparable.[95] *See McDaniel*, 940 F.3d at 368–69. Moreover, Dion gave special assignments to store directors over 60 years old. [184] ¶¶ 17–19. Under any method of proof, Esboldt fails to put forward enough evidence of age discrimination.[96]

### 7. Lester Nelson

---

[93] Esboldt's testimony about the "working out" theory is inadmissible. *See supra* note 57.

[94] Proving the "legitimate expectations" prong in a prima facie case is not necessary when a plaintiff admits to violating company policies but is alleging that he was punished more harshly than non-protected employees that violated that policy. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008). This is not the case here, as Esboldt does not allege that Jewel permitted younger store directors, who committed fraud, to continue working.

[95] Esboldt generally states that younger store directors were given better stores, more help, and shown favoritism, specifically Scott Allen, Joe Neri, and John Cutler, who were in his district, and Nisa Stewart, Jose DeJesus, and Dennis Valentine, who were outside his district. [203] ¶¶ 9–10. While not dispositive, Esboldt himself worked at non-operationally challenged stores. [184] ¶ 23.

[96] Esboldt withdrew his ADEA retaliation claim. [183] at 7.

Nelson's voluntary decision to leave Jewel to work for a competitor does not amount to constructive discharge.[97] The non-actionable evidence Nelson uses to support his claim fails to demonstrate age discrimination. While Nelson's superiors instructed him to "work out" out subordinates in 2010 and 2011, which made Nelson associate PIPs with termination, [212] ¶¶ 3, 7, there is no evidence of the subordinates' ages or Jewel's age-animus. Unlike other plaintiffs, Nelson experienced successful visits by president Withers and VP Jerry Otis in 2014 and 2015. *Id.* ¶ 19. Nelson's subjective disagreement with Laryea's letter of concern about payroll, *id.* ¶¶ 8, 20–21, without more, is not an adverse action. *See Mollet*, 926 F.3d at 898. In fact, Nelson generally received good performance reviews from Laryea, [174] ¶ 16, unlike other plaintiffs. While Nelson experienced significant health issues, [212] ¶¶ 11, 25, including a car crash from work exhaustion, *id.* ¶ 10, Nelson's personal medical conditions are not evidence of Jewel's anti-age animus.

During the actionable time period, which began on May 24, 2016, [30-7], Brushenko issued Nelson a letter of concern for inaccurate labor reporting, [174] ¶ 18, poor performance and store conditions, *id.* ¶ 19, and food safety violations, *id.* ¶ 19, and placed Nelson on a PIP by January 2017. *Id.* ¶ 21. Nelson's subjective disagreement with these ratings, including his belief that Brushenko had unrealistic expectations and should have penalized the department managers first, [212] ¶ 8; [185-24] at 58–61, are insufficient to establish a discriminatory adverse action or

---

[97] Nelson's response brief, [173], contains numerous uncited facts that are disregarded. Nelson withdrew his ADEA retaliation claim. [173] at 8.

Jewel's pretext. *See Mollet*, 926 F.3d at 898. Nor does Nelson dispute that as a store director, he was ultimately responsible for his department managers. [187] ¶¶ 23–24. While Nelson felt disrespected by Brushenko,[98] [174] ¶ 27, one email from Nelson to Jewel executives, [212] ¶ 24, is not evidence of intolerable or ageist working conditions. In fact, instead of working on his PIP, Nelson resigned to go work for one of Jewel's competitors. [174] ¶¶ 4, 12, 14, 22. While Nelson may have been anticipating his discharge based on his poor performance, that anticipation, by itself, does not create intolerable working conditions. *See Chapin*, 621 F.3d at 679. Nelson made a choice to leave. He cannot establish he suffered an adverse action, let alone a hostile work environment, or constructive discharge.

Nelson's evidence about younger store directors receiving better labor budgets is speculation and disregarded. *See supra* note 62. While Laryea transferred two of Nelson's employees to a younger store director, [212] ¶ 9, Nelson fails to show the younger store director wa similarly situated or connect these practices to Brushenko. *See McDaniel*, 940 F.3d at 368–69.[99]

## IV. Conclusion

The reader might think that plaintiffs lost this case because of their lawyers. Their failure to comply with Local Rule 56.1—at times in a manner suggesting a lack

---

[98] Brushenko's age may be significant but is not dispositive because "persons of *any* age are capable of practicing age discrimination." *Mills v. First Federal Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 842 (7th Cir. 1996).

[99] While Jewel notes that younger store director Hollie Abernathy received a the letter of concern, [210] at 5, Jewel provides no further context to establish a valid comparison. *See also supra* note 4.

of candor—and their attempt to interject a theory of age discrimination through post-discovery affidavits certainly did the clients no favors. But the court has nevertheless scoured and dug into the record searching for a timely, preserved, and potentially viable claim on the part of any one of the plaintiffs. The evidence just isn't there.

Defendants' motion for summary judgment, [143], is granted. Enter judgment in favor of defendants and terminate civil case.

Enter:

Manish S. Shah
United States District Judge

Date: March 2, 2020